UNITED STATES of America

v.

Jacob F. TUSSELL, Jr., Jonathan Sadow-
sky, Sal La Bate, Grant Davis, Mike
Nelson, William J. Laurie, Jr., Robert G.
Whalen, Charles T. Massaro, Robert I.
Cutler, Nils Cary Nelson, Eugene H.
Powell, III, Elizabeth Porto.

No. 76–158 Criminal.

United States District Court,
M. D. Pennsylvania.

Nov. 11, 1977.

S. John Cottone, U. S. Atty., Scranton, Pa., for plaintiff.

Arthur Burgess, Woodbridge, N. J., William Costopoulos, Lemoyne, Pa., Michael Kennedy, New York City, Carl R. Mapel, Lemoyne, Pa., Nino Tinari, William D. Harris, Philadelphia, Pa., Ward F. Clark, Doylestown, Pa., Edward A. Savastio, Upper Darby, Pa., Richard Meltzer, Philadelphia, Pa., Lawrence J. DiAngelus, Upper Darby, Pa., Jeffrey M. Miller, Philadelphia, Pa., for defendants.

### MEMORANDUM AND ORDER

NEALON, Chief Judge.

Defendants in this three-count indictment have filed individual and omnibus motions [1] to suppress the fruits of "electronic surveillance" and to suppress the fruits of allegedly illegal arrests, searches, and seizures.[2] Defendants are charged with conspiracy, importation of a controlled substance, and possession of a controlled substance (marijuana): all defendants are charged in the conspiracy and importation counts, see 18 U.S.C. § 2; 21 U.S.C. §§ 952, 960 & 963; only defendants Tussell and Sadowsky are charged in the possession count, see 21 U.S.C. § 955. These charges are the result of arrests, searches, and seizures made at or in the vicinity of an airport in Mount Pocono, Pa. after an unscheduled landing by a DC–6 in the early morning hours of December 13, 1976. Arrested at or in the vicinity of the airport were defendants Tussell, Sadowsky, Laurie, Whalen, Massaro, Cutler,

---

1. The individual motions to suppress were filed by defendant Mike Nelson.

2. Eleven defendants have been arraigned. A twelfth defendant has not been apprehended.

Nils Nelson, and Powell. The aircraft was traced with the assistance of an electronic tracking device known as a "transponder" that had been surreptiously installed in the plane by a Customs Agent. An evidentiary hearing was held on July 28, 1977 to consider the suppression motions.

■ Since the arrests, searches, and seizures were conducted without warrants, the government had the burden at the hearing of going forward with its proof. *See Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); 5 L. Orfield, Criminal Procedure under the Federal Rules § 41.54, at 744 & n. 13.5 (Supp.1976). The government's evidence consisted of three exhibits and the testimony of two Customs Agents (William Hamilton and Charles Wunder) and two Pennsylvania State Troopers assigned temporarily to Customs. The government did not produce, and was not required to produce, the informant who purportedly consented to the installation of the transponder and who piloted the plane. *See McCray v. Illinois,* 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967); *United States v. Freund,* 525 F.2d 873, 876–77 (5th Cir. 1976) (unidentified informant).

■ The testimony heard often contained elements of hearsay which might have been excluded at trial but which I allowed for whatever probative value that testimony had. This is permissible at a suppression hearing without regard to the matter in issue, although the court remains obligated to weigh the evidence and discount that which is less reliable.[3] *See* Fed.R.Evid. 104(a) & 1101(d)(1); *United States v. Matlock,* 415 U.S. 164, 172–75, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *United States v. Lee,* 541 F.2d 1145 (5th Cir. 1976). Defendants offered no testimony or evidence of their own.

■ Consent relating to the installation of the transponder was the primary issue that involved hearsay testimony. In this case neither the government nor the defendants called the aircraft's pilot, who had allegedly given consent.[4] Defendants argued at the hearing that the nature of consent requires first hand testimony from the person allegedly giving consent. The Federal Rules of Evidence, however, make no such distinction and permit the use of hearsay testimony without regard to the issue involved. *See* Fed.R.Evid. 104(a) & 1101(d)(1); *Matlock,* 415 U.S. at 172–75, 94 S.Ct. 988; *Lee,* 541 F.2d at 1146. Moreover, in cases where the consent of a *defendant* is in issue, it is obvious that, although the government cannot compel the defendant's testimony, the court is not disabled from nevertheless determining defendant's consent. The crucial question is not what the matter in issue is but rather what probative value the proffered testimony has.

The hearing consumed day and evening sessions on July 28, 1977; the hearing transcript consists of more than 400 pages of testimony. At the close of the hearing I set a schedule for the filing of post-hearing briefs supporting and opposing the motions to suppress. At defendants' request, a brief filed September 12, 1977 by counsel for defendant LaBate is being treated as an omnibus brief filed on behalf of all defendants. In addition, individual briefs were filed by defendants Tussell and Mike Nelson. The government sought and received an extension of time within which to respond; its opposing brief was filed October 13. Defendant LaBate sought and received an extension of time within which to file a reply brief; this brief was filed November 3. The suppression motions are now ripe for determination, and they will be denied for the reasons that follow.

*Finding of Fact*

On or about November 3, 1976, Charles Wunder, an Agent for the United States Customs Service working on various inves-

---

**3.** Similarly, I permitted the introduction into evidence without formal authentication of photostated copies of the general declarations executed by the crew of the DC–6 and a copy

of the lease agreement governing use of the aircraft during all material times.

**4.** *See* note 24 *infra.*

tigations in the Mount Pocono, Pa. area, was approached by the manager of the Mount Pocono Airport. The manager, a Mr. Carl Nassauer, advised Wunder that he had been contacted by certain persons in an effort to enlist his cooperation for illegal activities. Throughout early November, Wunder testified, Nassauer was in frequent communication with him on a confidential basis. Nassauer had been told by these persons that a large plane would require a landing place in an isolated area of the airport, that 600 gallons of fuel would be needed,[5] that the plane would be involved in some unloading described as being a "little bit illegal" because of the lack of federally required unloading certificates, and that he would be well taken care of for his help. The money for the purchase of the fuel was brought to Nassauer by a person who flew in specially from Florida for that purpose. (N.T. 188, 193, 226, 236–38, 274–75, 326–28). Sometime after November 12, 1976, Nassauer communicated to Wunder his belief that the unloading might involve marijuana. (N.T. 239, 334). The financial backing the operation was receiving caused Wunder to believe also that narcotics were likely to be involved. (N.T. 238).

At about the same time a separate investigation was underway in Florida. William Hamilton, an Air Officer for the Custom Service assigned to the Miami Air Support Branch, testified that, on November 12, 1976, he was called to the office of his supervisor, a Mr. Ragan, who is Chief of the Law Enforcement Section in Miami, and introduced to a Mr. Reds Mettrick. The witness, Mr. Hamilton, had not seen Mettrick arrive, and had no idea of what transpired during earlier portions of the meet-

ing between Mettrick and Ragan. Ragan indicated that Mettrick was a pilot who had leased an aircraft,[6] and that Mettrick had consented to the installation of a special transponder in that craft.[7] Mettrick was not under arrest; there is no proof in the record as to whether Mettrick appeared voluntarily or was requested to appear at the Customs Office. When Ragan asked Mettrick to confirm his willingness to have the transponder installed, Mettrick replied something to the effect, "Yes. Go ahead and install the transponder." (N.T. 15, 69, 72–73, 78–79, 100, 109). Mettrick mentioned the possibility that the plane's cargo would be marijuana, destined for transport to northeastern Pennsylvania. (N.T. 82, 97, 135). A rather detailed discussion between the witness, Mr. Hamilton, and the pilot, Mr. Mettrick, ensued during which technical questions relating to the mechanics of installing the transponder in the craft were discussed. Mettrick answered most to Hamilton's satisfaction. After the meeting Hamilton confirmed that Mettrick was a licensed pilot by checking "microfiche" files near the conference room. That evening, at about 9 P.M., Hamilton surreptitiously installed the transponder in the DC–6. While transponders are normally located in plain view, he installed the special transponder in such a fashion as to make it difficult to locate visually. This method of installation left unaffected the operation of the existing "primary" and "backup" transponders that are required by Federal Aviation Administration regulations.[8] (N.T. 11, 32, 43, 95–96, 109).

FAA regulations require that planes above a certain size, such as a DC–6, carry both primary and backup transponders in

---

5. Wunder was not aware of the range 600 gallons of fuel would provide. (N.T. 348). It is not a matter of record, however, where the airplane was headed after departing Mount Pocono.

6. *See* Government's Exhibit # 3. A lease, not available to the Customs Agents at that time, was introduced in evidence at the hearing to substantiate Mettrick's status as lessee of a DC–6 aircraft. Wunder conceded on cross-ex-

amination that Mettrick's subsequently prepared formal statement acknowledged that the money used to lease the plane was provided by some of the defendants.

7. A transponder is a device which emits identifying information when "interrogated" electronically by ground control stations. *See* discussion *infra*.

8. *See* 14 C.F.R. § 91.24 (1976).

order to provide information from which the plane's location, groundspeed, airspeed, and direction can be determined. In ordinary operation, a pilot is instructed by ground control to set the transponder being used to a specific identifying frequency. An automatic signal from ground control "interrogates" the transponder to obtain the desired information. The special transponders in use by the Customs Service emit a preset frequency, common to all such transponders, that cannot be adjusted while in use. A special transponder was installed in the DC–6 because of the belief that, should the plane be used in smuggling operations, the persons involved might turn off the primary and backup transponders. (N.T., 8–9, 12, 29, 36, 120, 152).

After the installation of the transponder on November 12, 1976, the DC–6 remained in the Miami vicinity for about one month. One brief flight was taken during this time with the pilot-lessee, Mr. Mettrick, at the controls. Although described by the witness Hamilton as a "test flight," presumably to permit certain persons to assure themselves of the aircraft's operability, the flight also enabled the Customs Agents to confirm that the transponder was functioning correctly. (N.T. 142–43).

The events in Florida and Pennsylvania were linked together by Wunder's discovery, on November 12, that the name of one of the defendants (Tussell) had surfaced in both investigations. Thereafter, Wunder kept in close contact with the Customs Agents conducting the Florida investigation. From those Agents he learned that international smuggling of a controlled substance could be involved and that a DC–6 was intended for use in the operation. (N.T. 188–89, 191–92, 223–24, 234, 240–41).

The cooperative arrangement between Wunder and his confidential informant

Nassauer also continued. Nassauer alerted Wunder to a "trial run" which was to be conducted at night during the Thanksgiving weekend. The trial run (personally monitored by Wunder) and the many conversations Nassauer had with several persons connected with the planning for the landing enabled Wunder to develop a list of persons by name or description and a list of vehicles and license plate numbers. In this matter Wunder also learned that these persons were equipping themselves with flares and citizens' band radios. The trial run involved the landing of a small private plane, and the coordinated movement of various vehicles to the isolated area of the Airport where the plane set down. During the trial run a "guard shack" was manned by one of the participants, apparently as a lookout. On a "half dozen" other occasions, Wunder secretly observed the airport in hopes that he could be present during the actual landing of the DC–6. On December 12, Nassauer informed him that the landing was scheduled for that evening. (N.T. 186–88, 197–98, 207, 273, 277, 360–69, 372, 376–77). Thereafter, Wunder heard from the Customs Agents in Florida that the plant had indeed departed.

After the filing of a general declaration by the pilot Mettrick indicating a destination of South Caicos, Bahamas,[9] the DC–6 left Miami on December 12, 1976 in the anticipated southeasterly direction. The flight was monitored until the plane was beyond the 300-mile range of the Miami air-traffic control equipment; South Caicos is located outside the United States, about 520 miles from Miami.[10] There was testimony that Miami Customs confirmed by phone the arrival of the DC–6 in South Caicos. The general declaration filed there showed a destination of "St. Lucia" on its next flight.[11] (N.T. 18–21, 64, 79–80, 243).

**9.** *See* Government's Exhibit # 1. While a flight plan may be given verbally, a general declaration is a formal statement by the pilot of the plane that the craft is departing from or returning to the United States. (N.T. 169).

**10.** As indicated *supra,* all transponders in use by the Customs Service are preset to the same frequency. Two other transponders in use by Customs in the Miami area were accounted for by Hamilton, and could not have been mistaken for the DC–6 in question. (N.T. 139–41).

**11.** *See Government's Exhibit # 2. The exhibit* was photostated from the original with a receipt obscuring the space used on the first page

Wunder began final work on assembling a team to intercept the DC–6 upon its arrival at the Mount Pocono Airport. His team consisted of Customs Agents, Agents of the Drug Enforcement Administration, and members of the Pennsylvania State Police assigned specially to the Customs Service. A meeting was held at Wunder's home in Mount Pocono at 6 P.M., December 12 to disseminate descriptions of persons and vehicles expected to be involved in the operation and to make assignments of responsibilities for the interception. (N.T. 86–88, 207, 297). The plan formulated at the meeting involved seizing and inspecting the contents of the aircraft, and holding persons found at the airport or in vehicles or places thought to be connected with the operation.[12] To that end, some of the seventeen members of the interception team positioned themselves around the isolated area of the airport that was expected to be used in the landing and had been used in the "dry run" over Thanksgiving. Others were assigned patrols on the adjacent access highway (Route 611) or in other airport areas. All remained hidden from view and maintained radio silence except for certain prearranged signals. There was no other air traffic because of the size of the airport[13] and the lateness of the hour. At least by the time the DC–6 arrived, the airport was under a heavy snowstorm with high winds. (N.T. 202, 205, 207, 210–11).

After loss of the plane's transponder signal 300 miles from Miami and telephonic confirmation of arrival in South Caicos, the DC–6 was not monitored again until it reached a point 20 miles east of Charleston, S.C. The Traffic Control Center in Washington, D.C. reported to the Customs Service the monitoring of a plane with the distinctive signal of the special transponder. The plane was observed heading in the general direction of Mount Pocono Airport; it made no other stops en route. The monitoring of the craft gave the Customs Agents, and in particular Mr. Wunder, reason to believe the DC–6 was returning to the United States and would make its first stop within the borders of the United States at the Mount Pocono Airport. The monitoring also enabled the Customs Agents to determine an estimated time of arrival. But it is equally clear that, had the transponder malfunctioned after its installation in Miami, because of the tip received from Nassauer on December 12 and because of separate information developed by the Florida investigation, Customs Agents would have been in position at Mount Pocono Airport on that night to intercept the DC–6 in the belief that it carried contraband. (N.T. 22, 79, 199, 280). Customs Agents were operating primarily on information from the Florida and Mount Pocono investigations that existed independently of that gained by the installation of and monitoring with the special transponder. (N.T. 166, 187).

At about 1 A.M. on December 13, the DC–6 landed at Mount Pocono Airport. The plane had appeared suddenly causing Wunder to leap behind a snowbank to escape detection. The members of the team kept their positions. From Wunder's position, about 350 feet from the runway where the plane had come to rest, he observed a station wagon pull up to the plane and two men exiting from the plane and departing in the vehicle. Subjectively, Wunder felt that, although technical violations of FAA regulations were fairly certain,[14] he had not seen anything indicative of a cargo and

---

to show destination. The Court has obtained an unobscured copy of the first page and has appended this copy to the exhibit. The information in this general declaration was available to the Customs Agents at that time and communicated to Agent Wunder at Mount Pocono. (N.T. 243–44).

12. This "holding" was described by Agent Wunder variously as detention and as arrest;

his characterization of these actions does not control the determinations here.

13. The Mount Pocono Airport is a small, noninternational airport with little, if any, commercial traffic.

14. Wunder testified that the Customs Service enforces the laws of other federal agencies as well. (N.T. 222, 229–30).

that, once unloading was in progress, there would be several more violations. Shortly before 3 A.M., vehicles (gas trucks, rental vans, and a Mercedes automobile) began pulling up to the plane and persons began unloading bales of an unknown material. After 20 to 30 bales had been transferred into a van,[15] Wunder gave the signal by radio for the members of the team to "close in" according to their prearranged assignments. (N.T. 165, 188–90, 201–03, 212, 355).

Twelve members of the team closed in on the plane and immediately adjacent vehicles. As Wunder rushed forward, and reached a point about 100 feet from the aircraft, he noticed a pungent odor which he identified, on the basis of his experience, as being marijuana. Wunder's shouts to persons in the vicinity of the plane went unheeded because of the noise caused by the severity of the storm. He also observed a person who appeared to be reaching for a gun. Wunder fired a warning shot upwards which, because of his position under the wing of the plane, required him to lean backwards somewhat. A second shot was fired by another agent who mistakenly thought that Wunder had been fired upon.[16] (N.T. 203, 205–06, 312–13).

The first objective of the team was to detain and seize all equipment and personnel in the area. At some point during or immediately after the completion of this process, Wunder observed seeds and several broken bales. Five persons were arrested in the immediate vicinity of the plane.[17] In addition to the plane, the team seized eight tons of marijuana,[18] a Mercedes car, a station wagon, a van, and various items of equipment including radios and police scanners. (N.T. 164, 203–04, 216).

When the signal to close in was given over the radio by Wunder, the remaining members of the team carried out their assignments in other areas of the airport or on the adjacent access highway (Route 611). Pennsylvania State Trooper James Margle testified that his assignment was to arrest any person found occupying the "guard shack" that had reportedly been used during the trial run. As the police vehicle in which Margle was a passenger pulled up rapidly to the shack, a person emerged and began running away from the officers.[19] He was ordered to stop and was handcuffed at gunpoint. (N.T. 386–88, 391–92).

Other agents (including Corporal Ralph Marinetti of the Pennsylvania State Police) who were assigned to patrol Route 611 had, prior to the signal, observed a van with a Florida registration that matched one of the license numbers provided to the team at the 6 P.M. meeting. Corporal Marinetti testified that the vehicle was observed at about 2:30 A.M. travelling north along Route 611 (the access highway for the Mount Pocono Airport). The van appeared to be equipped with citizens' band (CB) equipment. The agents followed the van, which drove one-quarter mile past the airport entrance before making a "U-turn" and proceeding south. The van again passed the entrance and made another U-turn. While the van was travelling north again, the agents received Wunder's signal. The agents stopped the van and, after being joined by other members of the interception team, arrested the occupants. (N.T. 283–86, 297, 372, 377–81). The persons arrested had first names which matched names familiar to agent Wunder,[20] but it is clear that by this time the van occupants were already under arrest. (N.T. 293).

---

15. This was estimated to be one-third of the total number of bales brought in the plane. (N.T. 203).

16. There was no evidence that any of the defendants arrested carried a weapon.

17. These defendants were Tussell, Sadowsky, Laurie, Whalen and Massaro.

18. Count III of the indictment charges possession of approximately five and one-half tons.

19. It is not a matter of record whether the officer was in uniform at the time. The person arrested was the defendant Cutler.

20. Defendants Powell and Nils Nelson were arrested at this time.

There is nothing in the record to indicate that any evidence probative of guilt was seized at the time of the guard-shack and van arrests. These arrests were not made in the immediate vicinity of the landing site.

### Discussion

My examination of the legal issues here necessitates analyses of four separate events: (1) the entry into the DC–6 made on November 12, 1976 in order to install a special transponder; (2) the monitoring of the DC–6 in flight on December 12 and 13, 1976; (3) the interception of the DC–6 by Customs Agents early on December 13, and the seizure of incriminating evidence; and (4) the arrests of those defendants found at or nearby the landing site. Except for the possibility that illegality of action in one of these events may taint what would otherwise be legal governmental conduct in another, *see generally Wong Sun v. United States,* 371 U.S. 471, 491, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), each of these events must be examined separately to insure compliance with the Fourth Amendment to the Constitution.

Defendants have not established their standing to contest the constitutionality of the entry into the plane. Assuming, however, that all the defendants could establish standing through a proprietary interest in the lease of the aircraft, I find that the pilot of the aircraft, Mettrick, had the authority to, and did in fact, consent to the entry of the Customs Agents into the DC–6. As to the monitoring through the use of the special transponder, all but two of the defendants have failed to establish their standing. Again assuming instead that all of the defendants have standing, I hold that this monitoring violated no reasonable expectations of privacy because of the· customary monitoring of planes in flight that is conducted by air traffic control stations. Even assuming arguendo that one or both of these reasonable governmental intrusions were violative of the Fourth Amendment, I

would conclude that their taint was so attenuated as to not require suppression of the fruits of the third "intrusion"—the interception and seizure. I find further that the interception of the DC–6 occurred at the functional equivalent of the border and was based upon a reasonable suspicion of illegal activity. Because reasonable grounds existed, the Customs Agents were justified in searching the plane and the vehicles in the immediate vicinity of the plane, in seizing contraband, and in detaining persons found there. Finally, I conclude that the arrests of the persons in the immediate vicinity of the aircraft and the arrests of persons in another area of the airport and on the adjacent access highway were all conducted with probable cause.

### Entry into the Aircraft

 The entry into the DC–6 for the purpose of installing the special transponder (but before the transponder became operational) was a search subject to Fourth Amendment protection. *See United States v. Pretzinger,* 542 F.2d 517, 520 (9th Cir. 1976); *United States v. Hufford,* 539 F.2d 32, 34 (9th Cir.), *cert. denied,* 429 U.S. 1002, 97 S.Ct. 533, 50 L.Ed.2d 614 (1976). Obviously, Agent Hamilton was seeking entry into the plane with the expectation that evidence would later be obtained. *See Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *People v. Smith,* 67 Cal.App.3d 638, 136 Cal.Rptr. 764, 771 (5th App.Dist.1977). Since it is clear that Fourth Amendment rights are involved, I must determine who has standing to challenge the search and whether, as the government contends, there was consent given by Mettrick.

 Defendants' standing to contest the search is dependent upon whether defendants were in the plane at the time of search, allege a proprietary or possessory interest in the DC–6, or are charged with possession of (or a possessory crime involving) evidence seized *at the time of the search. See Brown v. United States,* 411

U.S. 223, 228–29, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973) (Burger, C. J., for an unanimous Court). *See also United States v. Oates,* 560 F.2d 45 (2d Cir. 1977) ("automatic standing" for person present at time of search and charged with possessory crime). *Cf. Jones v. United States,* 362 U.S. 257, 265, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) (interest in the premises or presence at the time of search establishes standing). There is no indication that any of the defendants were present when the plane was entered. Defendants argue that standing accrues from the fact that two of the defendants are charged with possession of a controlled substance and all the defendants are accused of importing or aiding and abetting importation, a crime which defendants contend contains an element of possession. *Compare United States v. Valencia,* 492 F.2d 1071, 1074 (9th Cir. 1974) *and United States v. Felix,* 474 F.2d 610 (9th Cir. 1973), *with Ortiz v. United States,* 329 F.2d 381 (5th Cir. 1964). Since the search (entry into the DC–6) took place on November 12, one month before the seizure of the controlled substance and one month prior to the date the indictment charges defendants with possession and importation (December 12, 1976), defendants are not charged with a possessory crime at the time of the search and do not, on this ground, obtain standing. *See Brown,* 411 U.S. at 227–28, 93 S.Ct. 1565 (possession two months *before* challenged search did not give standing). Standing is not conferred merely because a defendant claims prejudice through the introduction of evidence gathered in a search. *Jones,* 362 U.S. at 261, 80 S.Ct. 725. Defendants also argue standing on the ground that they had a possessory interest in the airplane. Little evidence was adduced on

this matter.[21] It is their contention that they supplied the money with which Mettrick leased the DC–6 and that Mettrick was the lessee "in name only."[22] Standing questions are not resolved on the basis, or according to the contours, of the law of property; a defendant has standing when a proprietary interest creates privacy expectations. *See Jones,* 362 U.S. at 263–67, 80 S.Ct. 725. One who merely finances the leasing of a plane does not have reasonable expectations of privacy as to that plane. *See United States v. McConnell,* 500 F.2d 347 (5th Cir. 1974), *cert. denied,* 420 U.S. 946, 95 S.Ct. 1327, 43 L.Ed.2d 424 (1975) (status as a creditor of a lessee). *See also United States v. Holmes,* 537 F.2d 227, 232 (5th Cir. 1976) (*en banc*) (dissenting opinion joined by seven Judges), *citing United States v. Nunn,* 525 F.2d 958 (5th Cir. 1976). Defendants' contention, however, appears to be that they were each engaged in a joint venture at the time of the entry into the DC–6 as evidenced by the supplying of cash to Mettrick for the payment of the lease.[23] This contention, by itself and without proof at the suppression hearing, is vague and conclusory and insufficient to establish standing. *See United States v. Guerrera,* 554 F.2d 987, 990 (9th Cir. 1977). Although defendants have not demonstrated standing, it will be assumed for the purpose of reaching the remaining issue with regards to entry into the DC–6.

■ Mettrick had the authority to consent to entry into the plane and in fact consented to the entry Hamilton made. Joint control provides the authority to consent to a search, and permits the introduction of evidence seized against others though they may not have given their con-

---

21. *See* note 6 and accompanying text *supra.*

22. Defendants' Omnibus Reply Brief filed Nov. 3, 1977 at 6.

23. The fact that some defendants supplied money would be of no benefit to their codefendants; there is no vicarious assertion of Fourth Amendment rights by codefendants

who cannot independently establish standing and a violation of privacy expectations. *Alderman v. United States,* 394 U.S. 165, 171–76, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). In this regard it should be noted that the testimony of a defendant at a suppression hearing is not admissible at trial. *Simmons v. United States,* 390 U.S. 377, 389–94, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

sent to the "waiver" of their rights. *See United States v. Phifer,* 400 F.Supp. 719, 732–33 (E.D.Pa.1975) (citing cases). At the time Mettrick's consent was sought, it was known that he was the pilot and lessee, even if in name only, of the plane. At least initially, the government is entitled to rely reasonably on the appearance of authority. *See id.* at 733. These appearances are amply supported in this record as fact. As lessee Mettrick had at least joint control over the plane and was authorized to give consent to the entry. *See United States v. Matlock,* 415 U.S. 164, 169–72, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *United States v. Murphy,* 506 F.2d 529 (9th Cir. 1974) (per curiam) (employee with authority to consent), *cert. denied,* 420 U.S. 996, 95 S.Ct. 1433, 43 L.Ed.2d 676 (1975). *Compare United States v. Abel,* 548 F.2d 591 (5th Cir.), *cert. denied,* 431 U.S. 956, 97 S.Ct. 2678, 53 L.Ed.2d 273 (1977), *with People v. Smith,* 67 Cal.App.3d 638, 136 Cal.Rptr. 764 (5th App.Dist.1977). Defendants' arguments to the contrary notwithstanding, as pilot of the craft, Mettrick had, in addition, special authority independent of whether the defendants had a proprietary interest under *Jones. See* 14 C.F.R. § 91.3 (1976) (pilot is the "final authority" as to the operation of a plane). *Cf. Phifer,* 400 F.Supp. at 733 (acquiescence of employer-lessee).

 There is no evidence of any coercion in the obtaining of Mettrick's consent for the entry; under these circumstances I can only conclude that his consent was freely and voluntarily given. It is not a matter of record whether Customs asked Mettrick to appear or whether Mettrick made a unilateral decision to cooperate with Customs by revealing to them his confidential information. Mettrick's consent appeared absolute when Hamilton entered the conference

room; nothing in their lengthy conversation thereafter indicated any unwillingness on Mettrick's part. *See United States v. Watson,* 423 U.S. 411, 424–25, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *Schneckloth v. Bustamonte,* 412 U.S. 218, 224–29, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Griffin,* 530 F.2d 739, 742–43 (7th Cir. 1976). Defendants argue that as an informer for the government Mettrick's consent should not be recognized.[24] In essence they argue that Mettrick is an informer because he gave information and consent for the search, but that he could not give consent because he was an informer. By this reasoning, all persons with joint control over premises sought to be searched would be disqualified from giving consent by the very fact that consent was given. Mettrick had the authority to give consent and gave that consent voluntarily.

### Monitoring of the DC–6 in Flight

 The DC–6 was monitored while in flight, first heading from Miami to a point 300 miles away in the direction of South Caicos, and again heading from a point 20 miles east of Charleston, S.C. to the landing site at Mount Pocono. As with the entry into the DC–6 to install the special transponder, the monitoring of the DC–6 in flight was an exploratory quest for evidence within the purview of the Fourth Amendment. *See Hufford,* 539 F.2d at 33; *United States v. Holmes,* 537 F.2d 227 (5th Cir. 1976) (per curiam) *aff'g by an evenly divided court en banc,* 521 F.2d 859 (5th Cir. 1975); *United States v. Bobisink,* 415 F.Supp. 1334, 1339 (D.Mass.1976). *See generally* 22 Vill.L.Rev. 1067 (1977). *Contra, United States v. Pretzinger,* 542 F.2d 517, 520 (9th Cir. 1976) (per curiam) (monitoring by a location device not a search.)[25] Thus,

---

**24.** There was no evidence that Mettrick was acting as an agent of, as opposed to any informer for, the Customs Service. Although there was some confusion as to whether the government intended to call Mettrick to the stand, on several occasions during the suppression hearing the Court offered defendants a continuance to locate and subpoena Mettrick, but they declined these offers.

**25.** The California court in *People v. Smith,* 67 Cal.App.3d 638, 136 Cal.Rptr. 764 (5th App. Dist. 1977), did not reach the question of whether monitoring was a search, deciding only that the installation of the transponder there violated reasonable expectations of privacy.

the question now is whether this search, admittedly done without benefit of warrant, was a reasonable one, and, as a preliminary matter, whether each of the defendants has standing to contest the constitutionality of the search.

■ The standing of each defendant, individually determined,[26] is dependent upon whether he is charged with possession of an illegal substance at the time of the monitoring, was present in the aircraft at that time, or had a proprietary interest in the DC–6 which gave him a reasonable expectation of privacy. *See Brown,* 411 U.S. at 228–29, 93 S.Ct. 1565. The record in this regard is again deficient: some of the defendants might have been able to establish the requisite proprietary interest;[27] and it is apparent that some might have been able to establish their presence in the aircraft at the time of the monitoring.[28] Defendants contend that standing is established because they are charged with possessory crimes at the time of the monitoring. Only defendants Tussell and Sadowsky are charged with actual possession; since the indictment charges possession on the day the monitoring occurred, defendants Tussell and Sadowsky have standing to contest the monitoring. *See Brown,* 411 U.S. at 228–29, 93 S.Ct. 1565; *Holmes,* 537 F.2d at 231–33 (*en banc* dissent). As to the other defendants, it is contended that the charge of importation of a controlled substance is a possessory crime, entitling them to "automatic

standing." If a conflict in the circuits ever existed,[29] it is clear now that the Courts of Appeals for both the Ninth and Fifth Circuits have adopted the same standard and rejected this position. *See United States v. Guerrera,* 554 F.2d 987 (9th Cir. 1977); *United States v. Gramlich,* 551 F.2d 1359 (5th Cir. 1977); *United States v. Valencia,* 492 F.2d 1071 (9th Cir. 1974).[30] I will assume standing for these additional defendants in order to reach the question of privacy expectations in the monitoring for all defendants.

■ The monitoring of the plane did not violate any reasonable expectations of privacy. *See generally Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). *See also United States v. White,* 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) (plurality opinion). FAA regulations, discussed supra, require that planes such as a DC–6 be equipped with transponders. In accordance with this regulation, the DC–6 was so equipped. The transponders ordinarily in use and the special transponder placed in the plane by Customs transmit essentially similar information and do not, for example, provide a means of overhearing conversations within the plane. The information supplied during monitoring is integral to the regulation of aircraft flight; the monitoring is an intrusion anticipated and, indeed, welcomed by aircraft passengers. Consequently, there is no reasonable[31] expectation of privacy disturbed

26. *See* note 23 *supra.*

27. *See* notes 22–23 and accompanying text *supra.*

28. When the plane landed, two persons were seen leaving the plane. The pilot, copilot, and flight engineer were found in the cockpit of the craft at the time of the arrests, apparently having never left the craft. These three were detained briefly but never arrested. The two who left the craft could be defendants here, but the record does not disclose who they were.

29. The *Felix* and *Ortiz* cases from the Fifth and Ninth Circuits appeared to be in conflict.

30. The cases from the Ninth Circuit are directly on point. The case of *United States v. Oates,* 560 F.2d 45 (2d Cir. 1977), is clearly distinguishable: the defendant there was present at the time heroin was seized from the person of his codefendant, and was charged with possession of heroin at the time of the seizure.

31. Defendants argue, apparently on the assumption that the primary and secondary transponders were in fact turned off, that their *subjective* expectations of privacy were violated. While defendants may have hoped that the movement of the plane would go unnoticed, expectations of privacy are judged by objective standards. *See, e. g., Hufford,* 539 F.2d at 33–34.

by such governmental activities. *Compare United States v. Hufford,* 539 F.2d 32 (9th Cir.), *cert. denied,* 429 U.S. 1002, 97 S.Ct. 533, 50 L.Ed.2d 614. (1976), *with United States v. Holmes,* 537 F.2d 227 (5th Cir. 1976) (per curiam), *aff'g by an evenly divided court en banc,* 521 F.2d 859 (5th Cir. 1975).[32] In addition since none of the defendants had rights violated during the entry to install the transponder, there was no infringement of Fourth Amendment rights by the monitoring. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).[33]

### Interception of the DC–6 and Seizure of Marijuana

The interception of the DC–6, the detention and seizure of equipment and personnel in the immediate area, and the seizure of eight tons of marijuana clearly represent a "search and seizure" within the purview of the Fourth Amendment. The defendants present at the time and place of the seizure have obvious standing. *See Brown,* 411 U.S. at 228–29,[34] 93 S.Ct. 1565. Those defendants not arrested in the immediate vicinity of the plane, i. e. those arrested some distance away or on the indictment, contend that the charge of importation gives them "automatic standing" to contest this seizure. Importation is not a crime for which possession is an essential element; these defendants are not afforded standing merely because they face charges of importation. *See United States v. Guerrera,* 554 F.2d 987 (9th Cir. 1977); *United States v. Gramlich,* 551 F.2d 1359 (5th Cir. 1977); *United States v. Valencia,* 492 F.2d 1071 (9th Cir. 1974); *United States v. Felix,* 474 F.2d 610 (9th Cir. 1973).[35] Again, these defendants, who could not establish standing because they were not present at the time of the seizure and have not been charged with a possessory crime, might have sought to show the requisite proprietary interest in the airplane.[36] Since there was insufficient evidence of a joint venture I hold that the three defendants arrested on the indictment and the three arrested in the guard shack and van have no standing to contest the seizure of the marijuana. I will assume arguendo standing for these six defendants in order to reach the question of the constitutionality of the interception for all.

The question of whether the interception and seizure are constitutional is dependent upon (1) whether the interception was made at the functional equivalent of the border; and (2) if so, whether there was reasonable suspicion that violations of the customs laws were taking place. Moreover, although I have found that neither the entry to install the transponder nor the monitoring of the plane in flight were viola-

---

**32.** The *Hufford* and *Holmes* cases take opposite views on the question of whether the use of electronic "beepers" in monitoring automobile traffic implicates Fourth Amendment rights. *See generally* 22 Vill.L.Rev. 1067 (1977). Beepers, unlike transponders, are devices that constantly emit a specific signal once they have been activated manually or by vibration and are not associated with a regulatory scheme. Transponders emit a signal only in response to electronic interrogation and are used as part of a regulatory scheme for air traffic safety. Thus the court in *Holmes,* unlike the situation here, was faced with an instance of governmental monitoring without a regulatory scheme that made such monitoring reasonable. Whatever expectation of privacy there may ordinarily be in the passage of an automobile along a public roadway is absent in the flight of a plane along closely monitored airways.

**33.** Were the regular transponders in an aircraft left operational, the taint of an illegal installation of a special transponder might be too attenuated to require suppression of the fruits of monitoring. Here, it is not a matter of record whether, as Customs had feared, the primary and backup transponders were turned off.

**34.** *See* note 17 and accompanying text *supra.*

**35.** The case of *Ortiz v. United States,* 329 F.2d 381 (5th Cir. 1964), must be considered to no longer be good law in this regard; the Court of Appeals for the Fifth Circuit has apparently adopted the Ninth Circuit rule. *See Gramlich,* 551 F.2d at 1362–63. *See also,* notes 29–30 and accompanying text *supra.*

**36.** *See* notes 22–23 and accompanying text *supra.*

tive of the Fourth Amendment, an otherwise permissible Customs inspection may be tainted by previous illegal governmental activity. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Thus, it must also be decided, assuming for the sake of argument that I had found either the entry or monitoring to be illegal, (1) whether the interception would still be considered to have been made at the functional equivalent of the border; and (2) whether there would still be reasonable grounds to believe customs laws were being violated. Obviously, the issues of functional equivalency and reasonable basis must be judged according to the information known to Customs Agent Wunder at the time he gave the signal for the interception and seizure. This information existed in five broad categories: (1) confidential information supplied by Mr. Nassauer, the manager of the Mount Pocono Airport both before and after November 12, 1976—the date of the entry into the DC–6; (2) confidential information, obtained by Customs Agents in Florida and relayed to Wunder after November 12 and before December 12, which resulted from their investigation but not as a consequence of the installation or operation of the transponder;[37] (3) information gained from the use of the transponder in monitoring the flight of the DC–6 on December 12 and 13; (4) information relayed by Customs Agents in Florida on December 12 from sources other than the transponder; and (5) information gained by Wunder's own observations.

■■■ The United States Customs Service, as part of its broad authority, may make investigatory stops and searches at the international borders and at locations that are the "functional equivalent" of the border. *See Almeida-Sanchez v. United States,* 413 U.S. 266, 272–73, 93 S.Ct. 2535,

37 L.Ed.2d 596 (1973); *United States v. Beck,* 483 F.2d 203, 207–08 (3d Cir. 1973), cert. denied, 414 U.S. 1132, 94 S.Ct. 873, 38 L.Ed.2d 757 (1974); *United States v. Glaziou,* 402 F.2d 8, 12 (2d Cir. 1968) (border area elastic; dependent upon factual context), *cert. denied,* 393 U.S. 1121, 89 S.Ct. 999, 22 L.Ed.2d 126 (1969). *See also United States v. Diaz,* 503 F.2d 1025 (3d Cir. 1974) (per curiam).

■■■ Since the Customs Agent in charge of intercepting the plane, Agent Wunder, had a reasonable basis for believing that the flight was international, the interception was made at the functional equivalent of the border. *See United States v. Ivey,* 546 F.2d 139, 143 (5th Cir. 1977). In the fourth category of information, viz., that obtained on December 12 from sources other than the monitoring of the DC–6 in flight, Agent Wunder knew that a general declaration had been filed in Miami indicating an intention to fly to South Caicos, that the DC–6 had landed in South Caicos (the phone conversation), and that a second general declaration had been filed there indicating another foreign destination. In the second category of information, viz., that obtained from the Florida investigation and connected with the Pennsylvania operation through the name "Tussell", Wunder knew that Mettrick had been hired to fly contraband from a foreign destination to northeastern Pennsylvania. In the third category of information, it was known from the monitoring of the DC–6 that the plane flew 300 miles from Miami toward South Caicos and from South Carolina to Mount Pocono. Clearly, there was a reasonable basis from which Wunder could conclude that an international flight had occurred. There was no information that the DC–6 had cleared customs elsewhere; a

---

37. Much, if not all, of this information was supplied by the pilot Mettrick. There is no showing that Mettrick was a paid informant or cooperating with the government to obtain leniency for criminal conduct he had engaged in. Rather, it would appear that Mr. Mettrick stepped forward on this one occasion to assist governmental agents in the enforcement of federal law. Therefore, past reliability need not be shown.

customs inspection was clearly called for.[38] *See Ivey,* 546 F.2d at 143; *United States v. Brennan,* 538 F.2d 711 (5th Cir. 1976), *cert. denied,* 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538 (1977). *See also, United States v. Mirmelli,* 421 F.Supp. 684, 687 (D.N.J. 1976), *aff'd mem.,* 556 F.2d 569 (3d Cir.), *cert. denied,* —— U.S. ——, 98 S.Ct. 115, 54 L.Ed.2d 92 (1977).[39] Even if the third category of information, viz., that gained by monitoring, were excluded, there was an independent basis, amply supplied by information from the second and fourth categories, for believing that an international flight had occurred. Thus, any taint, were the entry or the monitoring found to be illegal, would be attenuated, and the suppression of the marijuana seized would not be justified. *See Wong Sun v. United States,* 371 U.S. 471, 484–91, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).[40]

■ Since the interception took place at the functional equivalent of the border, the investigatory stop and seizure of the marijuana need only be supported by a reasonable suspicion (or reasonable basis to believe) that a violation of the customs laws was taking place. *See Beck,* 483 F.2d at 207.[41] Since a border interception is involved, there is no requirement that a warrant be obtained or that probable cause exist. *See United States v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977); *United States v. Glaziou,* 402 F.2d 8, 12 (2d Cir. 1968), *cert. denied,* 393 U.S. 1121, 89 S.Ct. 999, 22 L.Ed.2d 126 (1969).

■ Agent Wunder had reasonable suspicion from which he could readily conclude that violations of the customs laws were taking place and on which he could order an investigatory stop and seizure in the immediate vicinity of the plane. In the first category of information, Nassauer made Wunder aware of the significant financial backing the operation had, and provided Wunder with information that extensive preparations were being made for the landing and that the plane was to arrive on the night of December 12. From Florida Customs Agents prior to December 12 (second category), Wunder heard that the plane trip would involve international transporting of marijuana. On December 12 from nontransponder sources (fourth category) Wunder knew that general declarations had been filed in Florida and South Caicos and that the plane had actually landed in and taken off from South Caicos. In the the fifth category Agent Wunder per-

---

**38.** Other factors, which will be discussed infra, relate more closely to the question of whether there was a reasonable suspicion that customs laws were being violated. For example, the evident financial backing the operation had would be entitled to consideration in determining whether reasonable suspicion existed, *see Diaz,* 503 F.2d at 1026 n. 1, but would not provide a reliable indication that international flight had occurred. Similarly, the tip from Nassauer that unloading might be a "little bit illegal" because of the lack of FAA–required unloading certificates, would neither tend to show the flight was international nor provide a suspicion that violations of *customs* laws had occurred, but would help provide probable cause for the seizure were that seizure not supportable as a customs inspection. Customs agents, acting at places that are not the functional equivalent of the border, may make searches and seizures only on probable cause. *See, e. g., United States v. Brennan,* 538 F.2d 711, 716–19 (5th Cir. 1976), *cert. denied,* 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538 (1977).

**39.** The analysis in *Mirmelli* hinges on the routine nature of Customs operations at Teterboro Airport. 421 F.Supp. at 687 & 688. Mount Pocono Airport does not have routine customs operations. While the *Mirmelli* analysis would find some support in Judge Clark's earlier opinion in *Brennan,* he later identified the controlling factor in these cases as being the reliability with which it is known that the flight is international. *See Ivey,* 546 F.2d at 143.

**40.** Defendants argue, in essence, that but for the use of the transponder the seizure would not have been made. This is not the test; it need only be shown that the subsequent seizure had an independent basis. *See Brown v. Illinois,* 422 U.S. 590, 607, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (Powell, J., concurring); *United States v. Galante,* 547 F.2d 733, 740 (2d Cir. 1976); *United States v. Sand,* 541 F.2d 1370, 1376 (9th Cir. 1976).

**41.** At places which are not at the border or its functional equivalent, investigatory stops can also be made on reasonable suspicion, but searches and seizures must be supported by probable cause or consent. *See United States v. Brignoni-Ponce,* 422 U.S. 873, 879–82, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

sonally observed some of the activities connected with the Thanksgiving "trial run" and personally monitored the highly suspicious landing and unloading operations, conducted in a remote area of a small, generally noncommercial airport in the middle of the night during a severe snowstorm. No arrangements had been made for a special customs check at Mount Pocono, and Agent Wunder had no information that the DC–6 had cleared Customs elsewhere. Finally, by virtue of the monitoring of the DC–6 in flight, (the third category), Agent Wunder knew that the plane had flown 300 miles from Miami toward South Caicos and from South Carolina to Mount Pocono. With or without this third category of information, see Wong Sun, 371 U.S. at 484–91, 83 S.Ct. 407, Wunder had reasonable suspicion that violations of the customs laws had occurred. See Diaz, 503 F.2d at 1026 n. 1; Beck, 483 F.2d at 208.[42]

### Arrests Made at or in the Vicinity of the Landing Site

■ The Customs Agents participating in the interception made what, under the circumstances of the unusual landing, would be the ordinary course of conduct for the Customs stop and search. See, e. g., Ivey, 546 F.2d at 141; Brennan, 538 F.2d at 714. All persons at the point of interception, either in the plane or the plane's immediate vicinity, were detained. Whether there is any practical difference between this detention and an arrest is of no concern. Just as persons disembarking at a port following an international voyage must be held during a customs inspection of their baggage, see, e. g., Beck, 483 F.2d at 208, so must persons found with the plane await completion of the stop and search. That search disclosed the presence of a large quantity of a controlled substance. At that point at least there was probable cause to arrest the persons who from appearances were engaged in the actual unloading operation.

The arrests of the two persons in the van on the access highway and the arrest of the person in the guard shack are cast in a somewhat different light.[43] Continuing with the analogy to Beck involving the dock in an international port, the situation of these three defendants, arrested near the landing site but not in its immediate vicinity, is more closely akin to persons standing some distance from a dock area, thought to be confederates of the persons whose baggage is being inspected, but who are not international travellers and are not themselves carrying customs goods. In such a case Customs Agents are entitled to make an investigatory stop, but arrests would have to be made with probable cause. See United States v. Brignoni-Ponce, 422 U.S. 873, 882, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (dictum) (further detention after investigatory stop must be made with proba-

**42.** Were the Customs interception found not to have been conducted at the functional equivalent of the border, then, while an investigatory stop could still be made on reasonable suspicion, see Brignoni-Ponce, 422 U.S. at 879–82, 95 S.Ct. 2574, the search and seizure would require probable cause and, since there was no warrant, exigent circumstances. Probable cause to believe violations of federal law had occurred would be supplied by all the factors listed supra (excluding any information tainted under Wong Sun) and other information known to Agent Wunder: Nassauer was told that the unloading would be a "little bit illegal" because of the lack of FAA-required unloading certificates; and the landing of the DC–6 at Mount Pocono Airport was unauthorized. I do not reach the question of whether probable cause coalesced in time to obtain a warrant, see Zweibon v. Mitchell, 170 U.S.App.D.C. 1,

516 F.2d 594, 628–30 & n. 89 (1975), or whether it coalesced when the plane actually landed and was observed unloading. See United States v. Brennan, 538 F.2d 711, 719–22 (5th Cir. 1976), cert. denied, 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538 (1977). See also Chambers v. Maroney, 399 U.S. 42, 47–51, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); United States v. Kelly, 547 F.2d 82, 84 (8th Cir. 1977); United States v. McClain, 531 F.2d 431, 433–43 (9th Cir.), cert. denied, 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976).

**43.** These three persons were not arrested with the marijuana; there is no indicating in the record that anything incriminating was taken from them. Consequently, even if the arrests were found to be without probable cause, there is nothing to suppress.

ble cause). I find probable cause for the arrests, notwithstanding the fact that they were not personally engaged in the unloading operation.

The arrests of these three defendants was signaled by Agent Wunder when he told the members of the interception team to "close in." With regards to the two defendants in the van on the access highway (Powell and Nils Nelson), Nassauer had provided to Wunder, on the basis of Nassauer's contacts with persons making arrangements for the plane's landing, a description and license number for the van. This van was spotted driving along the access highway at 2:30 A.M. at about the same time the unloading was in progress nearby. It was equipped with CB radio and made several passes at the entrance to the airport. There was probable cause for the arrests of the occupants of the van. *See United States ex rel. Wright v. Cuyler,* 563 F.2d 627, 630 (3d Cir. 1977).

Similarly, with respect to the third defendant (Cutler), Nassauer provided critical information to Wunder to the effect that the guard shack located on airport property between the landing site and the access highway had been used during the trial run over Thanksgiving. At nearly 3 A.M. in the middle of a snowstorm, it would be most unusual to find such a shack occupied. As the officer approached, the defendant began running from the shack. The fact that the shack was occupied by a person at the time the unloading was in progress nearby supplied probable cause for the arrest. *See United States ex rel. Wright v. Cuyler,* 563 F.2d at 630 (3d Cir. 1977).

#### Conclusion

None of the defendants established standing to contest the entry into the DC–6. Assuming standing, I find that the entry was based upon valid consent. Only defendants Tussell and Sadowsky established standing to contest the monitoring of the DC–6 in flight. Assuming standing for the other defendants as well, I hold that this monitoring did not violate any reasonable expectations of privacy. Consequently, the motions to suppress the fruits of "electronic surveillance" will be denied.

The defendants arrested in the immediate vicinity of the plane established standing to contest the interception. Since the stop and search of the plane was conducted at the functional equivalent of the border on a reasonable suspicion that violations of the customs laws had occurred, and since the arrests of the defendants (including those not in the immediate vicinity of the plane) were conducted with probable cause, the motions to suppress the fruits of arrests, searches, and seizures will be denied.[44] Trial will be set for Monday, December 5, 1977, and for the reasons set forth in the memorandum of July 19, 1977, I will order a further period of exclusion under the Speedy Trial Act from November 12 to December 4, 1977.

---

**44.** Still to be considered are defendant Mike Nelson's motion for severance and defendant Cutler's motion to suppress identification testimony.