UNITED STATES of America,
Plaintiff-Appellee,

v.

Dennis Evans INGHAM,
Defendant-Appellant.

No. 72-2393
Summary Calendar.*

United States Court of Appeals,
Fifth Circuit.

Oct. 24, 1974.

Rehearing and Rehearing En Banc
Denied Dec. 23, 1974.

---

* Rule 18, 5 Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al., 5 Cir., 1970, 431 F.2d 409, Part I.

Philip Daigneault, Torrance, Cal. (Court-appointed), John C. Ciolino, New Orleans, La., for defendant-appellant.

Robert W. Rust, U. S. Atty., Barbara E. Vicevich, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before BROWN, Chief Judge, and GOLDBERG and MORGAN, Circuit Judges.

JOHN R. BROWN, Chief Judge:

■ The only question in this appeal by one caught redhanded with two tons of marijuana aboard is whether to justify a warrantless non-probable cause search of a vessel newly arrived from a foreign port or place someone must actually have observed the vessel as her stem ploughed over the imaginary boundary between International waters and Customs waters of the United States. Just how this is to be accomplished is not clear, whether by a sort of prohibition era counter-hovering ship, 19 U.S.C.A. §§ 1701, 1401(n) or an overhead helicopter each suitably stationed at sightable intervals along the thousands of miles of our East, West and Gulf coastlines. But it doesn't matter since we reject any such rigid mechanical and unrealistic requirements. We affirm.

Dennis Evans Ingham was charged, along with two others, in a three count indictment with violations of 21 U.S.C.A. §§ 963, 952(a) and 841(a)(1).[1] The indictment charged, in Count I, that the defendant conspired with others to import into the United States approximately 4,000 pounds of marijuana; in Count II, that the defendant imported into the United States approximately 4,000 pounds of marijuana; and in Count III, that the defendant possessed that marijuana with the intent to distribute it. Prior to the trial, the appellant filed a timely motion to suppress the fruits of the government's search of his vessel, M/V Nurmi, on the ground that the search and seizure violated his Fourth Amendment rights. The trial court denied appellant's motion after postponing the hearing to the trial. The jury found Ingham guilty as charged in all three counts.

■ The sole question presented for review is whether the government's

---

1. 21 U.S.C.A. § 963 provides:

Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

Section 952 provides:

(a) It shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance in schedule I or II of subchapter I of this chapter, or any narcotic drug in schedule III, IV, or V of subchapter I of this chapter, except that—

(1) such amounts of crude opium and coca leaves as the Attorney General finds to be necessary to provide for medical, scientific, or other legitimate purposes, and

(2) such amounts of any controlled substance in schedule I or II or any narcotic drug in schedule III, IV, or V that the Attorney General finds to be necessary to provide for the medical, scientific, or other legitimate needs of the United States—

(A) during an emergency in which domestic supplies of such substance or drug are found by the Attorney General to be inadequate, or

(B) in any case in which the Attorney General finds that competition among domestic manufacturers of the controlled substance is inadequate and will not be rendered adequate by the registration of additional manufacturers under section 823 of this title,

may be so imported under such regulations as the Attorney General shall prescribe. No crude opium may be so imported for the purpose of manufacturing heroin or smoking opium.

Section 841(a)(1) provides:

(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or

(2) to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance.

search and seizure of 4,000 pounds of marijuana from the appellant's vessel fell within the purview of a "border search" or should have been governed by the more stringent procedures applicable to a "domestic search". We find the conduct of the Customs agents under the circumstances fully justified as a customs search of a newly arrived vessel whether characterized as "border search" or not.

A recital of the events which preceded the arrest may be briefly stated.

On December 13, 1971, Ingham, using the alias of Dennis Kaufman purchased the 42 foot M/V Nurmi for $55,000 cash. A co-defendant, Stephen McCarthy, on December 22, 1971, entered into a rental agreement for the lease of a house located at 240 Golden Beach Drive, Golden Beach, Florida. The lease was to cover the period January 1, 1972 to April 30, 1972.

Customs agent William Norsworthy testified that he had first received information concerning M/V Nurmi on January 8, 1972, at which time he initiated a search to ascertain where the vessel was berthed. On January 11, 1972 and again on January 12 she was located at the dock behind the residence at 240 Golden Beach Drive.

Several further sightings of M/V Nurmi occurred which, taken together, proved quite convincingly that the vessel, had been at a foreign port or place.[2]

On February 6, after returning from International waters, Ingham was observed docking and leaving the vessel by the agents. They then observed co-defendant McCarthy open the garage doors, at which time they approached him and identified themselves. At this point Ingham and co-defendant Meiggs ran out of the house and into the backyard where they were apprehended by other Customs agents. At approximately 8:05 p. m. McCarthy took the agents through the house and to M/V Nurmi where the agents detected the odor of marijuana and observed burlap bags in the after cabin. The agents subsequently discovered 79 such burlap bags on board containing 4,000 pounds of marijuana which were seized.

We are asked to accept the argument that when authorized federal agents elect not to search a vehicle or vessel at the point of crossing an international boundary line, and, further, when the agents voluntarily elect not to follow the vehicle or vessel after the crossing, and, lastly, when the agents, who have not observed the crossing, have sufficient time, both before and after the suspected crossing, to obtain a warrant—if possible—then, the warrantless search and seizure of the vessel or vehicle becomes unreasonable.

As support for this principle appellant cites a number of Ninth Circuit cases [3] which he asserts stand for the proposition that the absence of "actual

---

2. Sightings occurred on:

Jan. 25 and 26: by a private citizen, a government witness, that he saw M/V Nurmi in Cartagena, Columbia and that the Appellant was on board.

Feb. 6, 1972: at 1:00 p. m. by Customs agent Lynch in Bahamian waters near Cat Cay.

at 2:30 p. m. by Customs agent Lynch about 15 miles west of Bimini heading toward the Florida coast.

at 7:25 p. m. by Customs agent Walsh as it entered inland waters from the Atlantic Ocean through Baker's Haulover Cut, then turned north and headed up the intercoastal waterway.

at 7:45 p. m. by Customs agent Burton traveling north on the intercoastal water-

way as it passed under the Sunny Isles Boulevard Bridge.

at 8:00 p. m. by Customs agents Lynch and Norsworthy as it left the intercoastal waterway, entered a canal at the north end of South Island, and docked behind the residence at 240 Golden Beach Drive.

3. The appellant cites United States v. Mollat, 9 Cir., 1971, 448 F.2d 789, (airplane search), United States v. Carrion, 9 Cir., 1972, 457 F.2d 200, (airplane search), United States v. Garcia, 9 Cir., 1969, 415 F.2d 1141, (automobile search), and Contreras v. United States, 9 Cir., 1961, 291 F.2d 63, (automobile search).

observation" of a boundary crossing precludes a subsequent search from qualifying as a "border search."

Our reading of these airplane and automobile cases reveals no such rubric. Three of the cases turn on the absence of *any* indication of a border crossing, and not on the lack of an actual observation of a border crossing. United States v. Mollat, 9 Cir., 1971, 448 F.2d 789; United States v. Carrion, 9 Cir., 1972, 457 F.2d 200, 202; United States v. Garcia, 9 Cir., 1969, 415 F.2d 1141, 1144. Further, appellant's final case, Contreras v. United States, 9 Cir., 1961, 291 F.2d 63, held as illegal the search of an automobile that was stopped 72 miles from the border after it had already been allowed through at the border and had not been the object of pursuit or surveillance after the actual border stop.

We conclude, then, that these Ninth Circuit holdings are in no way inconsistent with the search here. The close surveillance of the M/V Nurmi revealed a border crossing and was followed by a continued sighting of the vessel until the search when she finally docked. In addition, although the events of this case are pre-*Almeida-Sanchez,* it matters not, since the facts do not qualify it as an *Almeida-Sanchez* border search. In *Almeida-Sanchez,* 1973, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596, the Supreme Court held as illegal the search of an automobile 25 miles north of the border with no indication that the car had even crossed the border. The Court pointed out that

> In the present case, by contrast, there was no such assurance that the individual searched was within the proper scope of official scrutiny—that is, there was no reason whatever to

believe that he or his automobile had even crossed the border, much less that he was guilty of the commission of an offense.

413 U.S. at 271–272, 93 S.Ct. at 2539.

Moreover, loath as we are to suggest further distinctions in this dynamic ever-expanding area, this may well be a Reverian "one if by land, two if by sea". For there is by act of God, nature, the Congress, and the activities of man a great difference between the landlocked vehicle and the nautical vessel in relation to our International borders. Congress has long recognized this and the law has to—and does—reckon with these differences often very specifically.[4]

There is no hard and fast rule that there must be an actual visual sighting of an international boundary crossing. In United States v. Hill, 5 Cir., 1970, 430 F.2d 129, a case whose facts are strikingly similar to the facts here, we rejected the like contention that the vessel was never actually seen crossing the international boundary three miles out at sea and thus the seized contraband should have been held inadmissible. Of "border searches" we wrote—

> "The extraordinary deference accorded this unique category of searches is based on a recognition of the difficulty involved in effectively policing our national boundaries. The facts of the present case dramatically illustrate the burden we would be placing on the officers charged with this responsibility, were we to accept appellant's position."

United States v. Hill, *supra* at 131.

■ The law—indeed criminal law—allows for common sense. And common sense allows persons in their affairs to

---

4. The statutes dealing specifically with vessels and their entry for revenue and customs purposes are replete. A few are: 19 U.S.C. § 282 (foreign-purchased merchandise to be used on the vessel) ; 19 U.S.C. § 1431 (manifest on board to indicate a ship) ; 19 U.S.C. § 1433 (report of arrival of vessel) ; 19 U. S.C. § 1434 (entry of American vessels) ; 19 U.S.C. § 1436 (failure to report entry of vessel) ; 19 U.S.C. § 1460 (failure to file manifest) ; 19 U.S.C. § 1467 (special inspection, examination, and search of vessel) ; 19 U.S.C. § 1485 (consignee declaration of goods on entry) ; 19 U.S.C. § 1581 (boarding of vessels) ; 19 U.S.C. § 1701 (defines customs enforcement area and applies to hovering vessels) ; 19 U.S.C. § 1706 (importation in vessels under 30 tons) ; 19 U.S.C. § 1709 (definition of customs vessel).

draw inferences from circumstances. If credited, as was obviously done by the jury's verdict, the events detailed above (note 2, *supra*) revealed that both vessel and Ingham were in a foreign port and within a few hours time proceeded from international waters into domestic coastal waters and within less than an hour she was alongside the dock where the search took place. She could not have been both near Cat Cay and at the Florida dock on the same day unless she had made a voyage from outside the United States to the Florida dock. Just as did the jury, the Judge on the suppression motion could add up all these factors to conclude that the officers had ample grounds for believing that entry from international waters had just been made. For the protection of the revenues [5] and national security, the officers are entitled to search a newly arrived vessel to determine whether goods requiring entry are aboard. 19 U.S.C.A. § 1581(a).[6]

5. One of the primary purposes of the customs regulations is to raise revenues. Consequently, the custom's search revolves around goods and not persons. See note 4, *supra*. The customs search statutes are the very foundation for the vast amounts collected yearly from imports. The revenues from customs collections in 1972 alone amounted to $4,191,539,806.

According to an August 16, 1972 news release from the Bureau of Customs, the 15 largest collection districts and areas are as follows. Each is designated by its headquarters court.

Total Customs Collections
Fiscal Year 1972

| | | |
|---|---|---|
| 1. | New York, N. Y. | $998,104,046 |
| 2. | Los Angeles | 368,480,700 |
| 3. | Detroit | 293,366,934 |
| 4. | JFK Airport | 287,888,472 |
| 5. | Chicago | 220,548,208 |
| 6. | San Francisco | 180,260,131 |
| 7. | Philadelphia | 174,445,912 |
| 8. | Baltimore | 135,314,589 |
| 9. | Boston | 130,702,129 |
| 10. | Seattle | 129,581,372 |
| 11. | New Orleans | 112,229,817 |
| 12. | Houston | 102,860,629 |
| 13. | Ogdensburg | 92,253,187 |
| 14. | Cleveland | 91,501,636 |
| 15. | Buffalo | 84,170,595 |

6. 19 U.S.C.A. § 1581(a) provides in part:

Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters . . . and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, truck, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.

Of course, the exercise of this power must still be reasonable. United States v. McDaniel, 5 Cir., 1972, 463 F.2d 129, 134. Judge Goldberg concluded that "under all of the circumstances involved here, the search of the vehicle was reasonable under the customs and immigration statutes and within the otherwise stricter confines of the Fourth Amendment." *Id.* at 134.

In United States v. Caraway, 5 Cir., 1973, 474 F.2d 25, the search of a vessel under 19 U.S.C. § 1581(a) was held illegal since there was no indication that the vessel had crossed an international boundary or that the contraband in question had ever been on the vessel. *Caraway*, however, lends no precedential value since the indictment underlying the appeal from a conviction was later dismissed by the District Court, thus rendering the issues moot. United States v. Caraway, 5 Cir., 1973, 483 F.2d 215, 216.

In addition to the search and seizure question, *Caraway* also concluded that a plea of nolo contendre, if coupled with an understanding from the Judge, would not destroy

For such a vessel under such a situation they need not be searching for anything more noxious than a bottle of Chanel No. 5.

The search was reasonable. There it ends.

Affirmed.

a challenge on appeal to evidence obtained from an allegedly unlawful search and seizure. This procedure was later criticized in United States v. Sepe, 5 Cir., 1973, 486 F.2d 1044, 1045, and United States v. Mizell, 5 Cir., 1973, 488 F.2d 97, 99–100.