**UNITED STATES of America,**
**Plaintiff-Appellee,**
**v.**

**Johnnie William IVEY and Joseph Taglione, Defendants-Appellants.**

**No. 76–1205.**

United States Court of Appeals, Fifth Circuit.

Jan. 28, 1977.

Rehearing Denied April 8, 1977.
See 550 F.2d 243.

---

Lester J. Quartel, Fort Lauderdale, Fla. (Court-appointed), for Ivey.

Fred Haddad, Fort Lauderdale, Fla. (Court-appointed), for Taglione.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Terrance Smiljanich, Asst. U. S. Atty., Tampa, Fla., for plaintiff-appellee.

Before TUTTLE, CLARK and RONEY, Circuit Judges.

CLARK, Circuit Judge:

Johnnie William Ivey and Joseph Taglione, along with a nonappealing codefendant, were each convicted by a jury on one count of importation and possession of marijuana with intent to distribute. On this appeal Ivey raises two issues: that the district court erred in denying his motion to suppress the marijuana found in a search of the aircraft involved, and that the assistant United States attorney engaged in prohibited conduct when he alluded in final argument to failure by the defense to call a witness. Taglione raises the same failure-to-suppress issue and, additionally, that there was insufficient evidence to convict him and that errors in rulings by the trial judge entitle him to a new trial. None of these issues have merit.

The operative facts are as follows. A twin-motored Lockheed Lodestar aircraft bearing United States civil registry N700L landed on South Caicos, a small island in the British West Indies, on August 3, 1975. The three defendants were the only occupants aboard N700L at that stop. All three completed local immigration forms. As the craft contained no cargo, there was nothing to declare and a British customs inspection at South Caicos confirmed this. N700L was cleared to depart South Caicos the following day. However, on August 5, N700L was still on South Caicos where it was observed by a local official and an over-fly-

ing United States Customs pilot. The Customs pilot placed a notification to "be on the lookout for" this aircraft with his Miami office. Also on August 5, the plane took on 277 gallons of fuel and 42 quarts of oil.

At approximately 3:00 p. m. local time on August 5, N700L departed South Caicos with a stated destination of Martinique, but without filing a flight plan. To the knowledge of the local officials, the aircraft contained no cargo when it departed the island.

The next official contact with N700L occurred when it was seen circling the Zephyrhills, Florida, airport by a local police officer, Russell Kirk, at about 4:00 a. m. on August 6. Zephyrhills is a small community approximately 40 miles northeast of Tampa which maintains an airport for light aircraft. The aircraft landed at the Zephyrhills field, taxied to the fuel pumps and stopped. Officer Kirk observed the plane for a few more minutes, but no one alighted therefrom. He returned to his local police station to have the dispatcher contact United States Customs officials concerning the plane, but a call from the Customs office in Tampa to the Zephyrhills police station occurred first. The Customs Service had been informed by an anonymous call that N700L was at Zephyrhills.

After a Customs officer questioned Officer Kirk, he was asked to return to the airport and detain the occupants of the airplane until Customs agents arrived. Officer Kirk complied with the request made to him by returning to the airfield and announcing to the defendants that Customs officers would be arriving from Tampa and they wished for the defendants to remain at the airport until after their arrival. Kirk testified that the defendants consented to the request, were asked for and gave identification, and then continued refueling their aircraft. At 5:05 a. m., a Customs communications officer in Tampa contacted Customs Patrol Officer Alexander Murphy and his partner by radio and told them to proceed to Zephyrhills. A few minutes after this call, a computer check on whether N700L had previously landed within the country was completed and a second radio call was placed to Officer Murphy, informing him that the Customs Service had no record of the aircraft's clearing a United States Customs inspection point.

The Customs officers arrived at 5:35 a. m., which, according to Officer Kirk, was 10 to 20 minutes after he requested the defendants not to leave. After determining from Officer Kirk the location of the aircraft he had reported, Officer Murphy walked directly to the plane and opened the door. He immediately noticed a very strong odor of marijuana. Inside the aircraft were 24 burlap-wrapped bales. All were subsequently found to contain marijuana. The total weight of the contraband was 2,100 pounds. The three men who had been on the aircraft were arrested by the Customs officers and advised of their rights. Taglione admitted that he was the pilot of the aircraft and stated the name of the owner.

The motions that defendants filed to suppress the marijuana discovered by the search of N700L had a twofold crux. First, the search which produced the marijuana was incident to and resulted from an illegal arrest by a municipal officer acting outside the scope of his authority. Second, the search by Customs Officer Murphy lacked a constitutional basis. If we were to focus on the actions of Officer Kirk only to decide whether his efforts constituted an arrest, we would bypass the central question in the suppression issue: At the time Officer Kirk detained the defendants, was United States Customs Service possessed of sufficient information to authorize this action? If the Customs Service possessed an adequate basis for such action, Kirk's request to the defendants to remain at the airport, whether it resulted in custody or something less, was a permissible act of assistance to a lawful activity. Since we decide that Kirk acted at the direction of Customs officials who did have the right, within the constitutional bounds of reasonableness, to stop the departure of defendants and N700L from Zephyrhills on this occasion, we do not need to decide whether Officer Kirk's actions amounted to an "arrest" of the defendants prior to the Customs agents' arrival.

■ The lawfulness of the initial detention of defendants and the aircraft in their possession is directly related to the ultimate right of the Customs Service to conduct a search of an aircraft situated as was N700L. In this regard, the Secretary of the Treasury has authority to promulgate regulations dealing with the arrival and inspection of aircraft from foreign lands. 19 U.S.C. § 1642 (1965). The applicable regulations, 19 C.F.R. §§ 6.2, 6.3 & 6.14 (1975), require that all incoming aircraft land at an international airport, prearrange another landing site with the Federal Aviation Agency, or secure prior Customs clearance for crossing an international border. None of these legitimate methods of landing in this country was utilized by those operating N700L. The Customs Service maintains a computerized information system to assist in its processing of all aircraft arrivals from foreign countries. The evidence revealed that the computer operation had certain shortcomings, including time-lags in the receipt of information as to Customs clearance which varied according to the method used by airports to transmit information to be entered in the computer. However, it was also established that the computer did give reasonably accurate information as to aircraft arrivals from foreign ports and was the best source of such information on this particular occasion.

■ Before Customs agents may legitimately conduct a border-type search of an aircraft, there must be a "high degree of probability that a border crossing took place." *United States v. Brennan*, 538 F.2d 711, 715 (5th Cir. 1976); *but see United States v. Lonabaugh*, 494 F.2d 1257 (5th Cir. 1973). Other courts have phrased the test as being one of enabling Customs officers to be "reasonably certain" that the object of the search has just entered from a foreign country. *United States v. Tilton*, 534 F.2d 1363 (9th Cir. 1976); *United States v. Vigil*, 448 F.2d 1250 (9th Cir. 1971). To reach the required degree of certitude, it is not necessary that the vehicle, aircraft, or vessel have been under "actual observation" from outside United States territory until its arrival and search. *United States v.*

*Ingham*, 502 F.2d 1287 (5th Cir. 1974); *United States v. Petersen*, 473 F.2d 874 (9th Cir. 1973). As the *Ingham* court stated, Customs agents are entitled to draw reasonable inferences from circumstances and base their actions on common sense judgments.

■ In *United States v. Brennan, supra*, the airplane which was the subject of the search had never been seen, or known to be, outside the United States. Though it had last been seen flying in a direction that could have led it out of the country, it was not tracked past the Miami, Florida, airport area. It is true that the aircraft was not seen again until sufficient time had elapsed to permit an international flight, and that the Customs Service had a tip indicating this aircraft would be involved in smuggling drugs, but these factors were held to be insufficient to establish that the plane had been to a foreign country. Before the border search rationale is applicable, a nexus must be established between a border and the object searched. *United States v. Soria*, 519 F.2d 1060, 1063 (5th Cir. 1975). This essential ingredient was missing in *Brennan*.

The evidence of a border-plane nexus was more substantial in the present case. Though it is true the present information does not rise to the level of certainty which was present in *United States v. Ingham, supra*, where the vessel searched was sighted several times in international waters as it sailed toward the United States, still a reasonable certainty of an international origin and first domestic landing at Zephyrhills by N700L did exist. The aircraft was last seen in South Caicos. Its flight plan upon departing this island was Martinique. When Customs agents checked their computer information system, they discovered no record of its having cleared Customs anywhere else in this country. When the aircraft arrived late at night, unannounced, in the secluded airport 13 hours after it had left from Caicos purportedly enroute to another foreign destination, there was reasonable certainty that Zephyrhills was the first touch down for the plane after an international flight.

The information possessed by the Customs Service at the time the essential cooperation of Officer Kirk was requested established beyond question that a border crossing had recently taken place and gave every reasonable inference that no prior Customs inspection had occurred since that crossing. Since the Customs agents thus were reasonably certain that the aircraft was entering from a foreign country and they reasonably believed it entered in violation of Customs regulations, *United States v. Bean*, 484 F.2d 1275 (5th Cir. 1973), and needed time to acquire a more complete picture, it was not improper to have another law enforcement official restrain the defendants so that the required Customs inspection could take place if it was determined none had yet been conducted. In *Marsh v. United States*, 344 F.2d 317, 325 (5th Cir. 1965), this court stated that circumstances of a Customs violation known to a Customs official would permit a telephoned request to a state constable 63 miles away to arrest the violators. In both *United States v. Reagor*, 441 F.2d 252 (5th Cir. 1971), and *Stassi v. United States*, 410 F.2d 946 (5th Cir. 1969), though the circumstances differ from those present here, the fact that state officials had not been formally deputized before working with Customs agents in conducting border searches did not invalidate them. Officer Kirk's statements to the defendants at the Customs agents' request which delayed the departure of an airplane and allowed a customs inspection to take place are not distinguishable from these precedents in which the contemporaneous assistance of non-Customs officials enabled the searches to be made.

The official actions of the early morning hours are not invalidated because the request to detain the aircraft was made to Officer Kirk before Customs officials had completed their computer check on its status. The times of the participants' actions are not sufficiently specific to make a definite determination as to whether the computer check had been completed prior to Kirk's arrival at the airport and request to the defendants. However, here the clear exigencies of the highly mobile airplane about to complete refueling required immediate action if the defendants were to be interdicted at the Zephyrhills airport.

The court-developed calculus used to determine the Fourth Amendment reasonableness of detention incident to a search uses a formula designed to produce a pragmatic answer. It establishes the degree of intrusion upon the rights of particular people to be secure in their persons and effects and the right of the general public to have the laws enforced. The two values then are integrated in light of the practical considerations which can be drawn from the facts of the actual situation involved. Given the sure knowledge that N700L was in a foreign country just hours before its unique appearance at this small airfield in the 4:00 a. m. darkness, that no special arrangements had been made for its inspection, and that it was not then known to have cleared Customs through any regular landing place, Customs officers acted reasonably in asking the on-the-spot law enforcement official to maintain the status quo. Because proper official action demanded that N700L be detained at least for the few minutes until a clearer fact picture emerged, we refuse to so parse each action or compartmentalize information by time that the broader concept of reasonableness is submerged. *United States v. Ragsdale*, 470 F.2d 24 (5th Cir. 1972).[1]

---

1. The defendants cite *Whiteley v. Warden*, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971). Nothing there counsels against the conclusions we have reached. *Whiteley* stands for the proposition that law enforcement officers are permitted to rely on the statements of other officers, but if the reporting officer did not have information sufficient to support the actions undertaken by the receiving officer, innocent reliance upon the report does not remove the actions from challenge. *Id.* at 568, 91 S.Ct. at 1037.

Neither is there merit to the contention that supporting the present search is an atavism of the "silver platter doctrine," in which the misdeeds of a state officer did not prevent the evidence improperly gathered from being used in a federal court. *Elkins v. United States*, 364

■ The second portion of defendants' appellate attack on the search-produced evidence centered on Customs Officer Murphy's action in proceeding directly to N700L and searching it without probable cause or reasonable suspicion. This contention must be considered in light of the status of the aircraft at the time of Murphy's entry. Since we have held that the facts obtaining made Zephyrhills the functional equivalent of the border, the test of his actions is the same as though the inspection had taken place at a regular customs immigration checkpoint located on the physical boundary of the United States. Once Officer Murphy was reasonably certain that N700L was the plane which landed at Zephyrhills after crossing an international boundary, his right to inspect does not have to be supported by probable cause or any degree of suspicion. *See, e. g., United States v. Williams*, 544 F.2d 807 (5th Cir. 1977); *United States v. Soria*, 519 F.2d 1060, 1063 (5th Cir. 1975); *United States v. Hart*, 506 F.2d 887, 895 (5th Cir.), *vacated and remanded for reconsideration*, 422 U.S. 1053, 95 S.Ct. 2674, 45 L.Ed.2d 706 (1975), *aff'd*, 525 F.2d 1199 (5th Cir. 1976). Officer Kirk's indication that N700L was the airplane he had been detaining gave Officer Murphy the right to inspect it.

■ Taglione's reliance on *United States v. Carrion*, 457 F.2d 200 (9th Cir. 1972), to support the contention that proof of importation was lacking is misplaced. Here, Customs officials knew that defendants and N700L had come to Zephyrhills from outside the continental limits of the United States. Examining the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), the jury verdicts were amply supported by the evidence.

■ The remaining issues on appeal concern errors allegedly committed by the judge and assistant United States attorney during the trial. The first of these relates to a failure to require the prosecution to distinguish the precise botanical plant involved. The fact that different species of marijuana do exist and that scientific evidence was not adduced to pinpoint the species found in defendants' aircraft cannot be the basis of a defense to charges of importation and/or possession such as involved here. *United States v. Henley*, 502 F.2d 585 (5th Cir. 1974); *United States v. Gaines*, 489 F.2d 690 (5th Cir. 1974). The copies of the foreign immigration cards issued to defendants were properly authenticated and admitted. The judge did not abuse the discretion vested in him to control the introduction of evidence by admitting a map of the area within which the defendants acted which was not challenged as to its accuracy. The statement of the assistant United States attorney in rebuttal argument that either side could have called the airport manager was in response to a portion of the argument made by the defense, and was not an impermissible comment upon the failure of the defense to introduce evidence, call witnesses, or place the defendant himself on the stand. *United States v. Harrington*, 543 F.2d 1151 (5th Cir. 1976). The jury was properly instructed at the close of the arguments that the defendant is not required to call any witnesses or introduce any evidence. Moreover, no objection was made to this argument, and the statement does not constitute an exceptional circumstance which requires reversal to prevent a clear miscarriage of justice. *United States v. Parr*, 516 F.2d 458 (5th Cir. 1975); *United States v. Washburn*, 488 F.2d 139 (5th Cir. 1973). Finally, defendant Taglione claims that allowing proof he admitted to Officer Murphy that he was the pilot of the airplane and gave the name of the individual who owned the aircraft, then did not answer any other questions, was an impermissible attempt to impute guilt by bringing to the jury's attention a refusal to answer questions. This is entirely too speculative to merit consideration. There was no argu-

U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). Since we hold that Officer Kirk did not act improperly in assisting Customs officials in

conducting a lawful border search, there is not the initial illegality which underlay the "silver platter" cases.

ment to the jury of inference of guilt by silence. *See Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). The government had a right to apprise the jury of Taglione's admissions. No request for an instruction to disregard was made, and there was no error in refusing the demand for a mistrial.

The convictions are

AFFIRMED.