**UNITED STATES of America, Plaintiff,**

v.

**George Lee MAYER, Robert Schrack, William O. Ransom, Defendants.**

**No. CR 85–66J.**

United States District Court,
D. Utah,
Central Division.

Sept. 16, 1985.

Bruce C. Lubeck, Asst. U.S. Atty., Salt Lake City, Utah, for plaintiff.

G. Fred Metos, Stephen R. McCaughey, Kenneth R. Brown, Salt Lake City, Utah, for defendants.

## MEMORANDUM OPINION AND ORDER

JENKINS, Chief Judge.

This matter came before the court on the defendants' motions to suppress evidence. It raises several issues about the validity of a warrantless search of an airplane and an airplane hangar.

On July 31, 1985, the court received evidence and heard arguments on the motions. Bruce Lubeck appeared for the United States. Stephen McCaughey appeared for the defendant Robert Schrack, Kenneth R. Brown appeared for the defendant William O. Ransom, and G. Fred Metos appeared for the defendant George Lee Mayer. The defendants Ransom and Mayer were present. The defendant Schrack, having failed to return to a half-way house to which he had been confined, did not participate in the motions.

The United States offered three witnesses: Michael Allen Crew, the customs officer who directed the search; Christian Ronnow, a Utah state circuit judge who, over the telephone, authorized the search; and Raymond C. Goodwin, a lieutenant in the Beaver County sheriff's office who participated in the search. The defendants presented no evidence. At the conclusion of the arguments, the court denied the defendants' motions to suppress. The court found that the defendants had not demonstrated that they had a reasonable expectation of privacy in either the airplane or the hangar. Accordingly, the court found that, on the record then before the court, the defendants' fourth amendment rights had not been violated. However, the court denied the motions without prejudice

and gave the defendants leave to file the motion a second time.

On August 20, 1985, this matter came before the court on the defendants' renewed motions to suppress. Once again, Bruce Lubeck appeared for the United States, Kenneth Brown appeared for the defendant William O. Ransom, and G. Fred Metos appeared for the defendant George Lee Mayer. The defendants Ransom and Mayer were present. No one appeared for the defendant Robert Schrack, who apparently was still at large.

At this hearing, the parties stipulated that the witnesses who testified at the prior hearing were not required to testify again, and that if they did testify, they would testify exactly as they had before. The United States then presented four additional witnesses: Gerald R. Young, a customs radar operator; Darrell J. Hjerbe, a customs electronics sensor systems operator; John R. Cole, a customs pilot; and David A. Paull, a special agent with the Drug Enforcement Administration. The defendants also each testified briefly.

At the conclusion of arguments on the motions, the court reserved ruling on the motions. Now, after reviewing the transcripts of the two hearings, and after examining the memoranda submitted by the parties, the court enters this memorandum opinion.

## I. FINDINGS OF FACT

On April 5, 1985, just before sundown (about 6:55 p.m. MST), a United States Customs radar operator stationed at Davis Monthan Air Force Base in Southern Arizona detected an unidentified aircraft flying northbound through a military restricted area about 58 miles north of the Mexican border. The plane was not equipped with an operating transponder, an electrical device that helps radar operators to identify a specific aircraft.[1] At the time it was first detected, the plane was flying at a low

---

1. The United States admits that it was lawful for the defendants' aircraft not to be equipped with an operable transponder. *See* 14 C.F.R. § 91.24 (1985).

altitude,[2] it was coming from an unpopulated area, and it was traveling in a direction that was inconsistent with air travel normally found in the area. Between the border and the point at which the radar operator first detected the airplane, there are two small, unlighted airfields.

The radar operator then instructed a customs Cessna Citation jet stationed at Davis Monthan to pursue the unidentified airplane. He also instructed a Cessna 210 airplane stationed in Phoenix to travel north to assist in chasing the suspect target. The radar operator directed the Citation jet to the point at which the jet's crew made visual contact with the suspect airplane. The Citation, which was equipped with both radar and a forward looking infrared sensor, moved in close enough to identify the target as a high wing, single engine aircraft.

The Citation followed the target from the time it made visual contact until the target landed in Milford, Utah. During the trip to Milford, the target turned its navigational lights off and on twice, and then, about 30 to 40 minutes before landing, extinguished all its lights. It then landed without using landing lights or navigational lights. During the period of time that the navigational lights were out, the Citation kept track of the target by using the forward looking infrared equipment. From the time the target first appeared on the radar screen until it landed, it maintained a constant course. After the target landed at Milford, the Citation crew watched the aircraft being pushed into a hangar at the airport.

About five minutes later, the customs Cessna 210 arrived and landed. Before landing, Agent Crew, one of the customs agents on board the 210, had contacted the Beaver County Sheriff's office and asked the local authorities to detain any people in the area of the hangar. Lieutenant Goodwin of the Beaver County Sheriff's Office had already arrived at the hangar and had detained Ransom, one of the defendants. After landing, Agent Crew questioned Ransom. He first asked Ransom how long he had been there and what he was doing. Ransom responded that he had been there about an hour and he was waiting for his brother-in-law to fly into the airport to do some work in the Milford area. Crew then asked Ransom whether any other aircraft had landed since he had been there. Ransom said "No," and asked to see his attorney. Crew then handcuffed and searched Ransom and placed him in Lieutenant Goodwin's police car.

The Citation pilot then directed Agent Crew to the hangar in which the suspect plane had been pushed. The hangar had been locked from the outside with a padlock. Crew shined a flashlight through a three by five inch hole in the bottom of one of the hangar doors. Through the hole he could see a single-engine airplane and two pairs of legs moving around.

At that time, Lieutenant Goodwin advised Agent Crew that it was possible to obtain a telephonic search warrant from a state judge in Cedar City. Crew testified at the hearing that although he felt he had "more than enough cause for a customs search," he "saw no reason that [obtaining a search warrant] would hurt." Transcript, July 31, 1985, p. 22. Crew and Goodwin then telephoned Christian Ronnow, a Utah state circuit judge. After they recited to him the facts as set forth

---

**2.** Although the radar operator was unable to tell from his radar screen what the airplane's altitude was, the radar operator did testify that the radar had the capacity to "see" into Mexico if an airplane is high enough. The court infers from the fact that the plane was not discovered until it was 58 miles north of the border that the plane was flying low enough to cause the curvature of the earth to block the radar until the plane reached the point at which it was discovered.

The defendants argue that because radar with the capacity to locate targets in Mexico did not locate the defendants' airplane until it was 58 miles north of the border, the court must conclude that the plane did not come from the border. In making that argument, the defendants disregard the limitation of the radar in locating objects blocked from the "view" of the radar by the curvature of the earth.

above,[3] he told them that they had more than enough probable cause for a search warrant and that they could go ahead and search the hangar and the aircraft. At that time, the judge also informed the officers that he had no recording equipment. The United States concedes that Crew and Goodwin did not comply with the procedural requirements to obtain a telephonic search warrant under Utah law. It is also evident that at least Goodwin knew that they had not complied with those procedural requirements.

After concluding this conversation with Judge Ronnow, Crew yelled to the men inside the hangar to pound on the door if they wanted to get out. The men inside pounded on the door. Lieutenant Goodwin then told Ransom that he and Crew had obtained a search warrant to enter the hangar and that if Ransom had a key they would not have to cut the lock off. Ransom told Goodwin that the key to the hangar was in his watch pocket on the right side. Goodwin found the key where Ransom said it would be and opened the hangar. At some point, Ransom was informed of his Miranda rights. It simply is not clear whether his rights were read to him before or after he told them where the key was. Accordingly, the court finds that Ransom was not informed of his right to remain silent until after he had indicated where the key to the hangar could be found.

Inside the hangar the government officers found the other two defendants, Mayer and Schrack; a high wing, single-engine airplane; 29 bales of marijuana; a 200-gallon fuel tank with hoses and fittings; an electric gasoline pump; two two-way radios; a pair of night vision goggles; and several tools on a work bench at the back of the hangar. Inside the airplane itself, the officers found marijuana debris, another pump and some fittings, and numerous aeronautical maps. All three defendants were arrested and the evidence was seized.

The defendant Mayer had subleased the hangar in November 1984 from Omni Cartwright. Mayer had given Ransom a key and had given him permission to store tools in the hangar. In exchange for the right to store tools in the hangar, Ransom had done concrete work for Mayer. Ransom actually stored tools in the hangar, which was kept locked at all times. At the time of the search itself, the hangar was locked. Based on this evidence, the court finds that both Ransom and Mayer had a subjective expectation of privacy in the hangar and its contents.

Ransom, Mayer, and Schrack were each indicted with one count of conspiracy to possess marijuana with the intent to distribute, and with one count of possession of marijuana with intent to distribute. Ransom and Mayer have filed motions to suppress all evidence seized as a result of the search of the hangar and the airplane. In addition, Ransom has filed a motion to suppress all statements he made at the time of the search.

## II. MOTIONS TO SUPPRESS THE EVIDENCE SEIZED DURING THE SEARCH OF THE AIRPLANE AND THE HANGAR

The Fourth Amendment to the Constitution of the United States provides as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or thing to be seized.

It is well settled that "searches conducted outside the judicial process, without prior approval by judge or magistrate are *per se* unreasonable under the Fourth Amend-

---

**3.** Judge Ronnow testified that both Crew and Goodwin mentioned the existence of marijuana. Both Crew and Goodwin testified that they said nothing at all about the existence of marijuana.

Because this court does not have to determine whether probable cause for the search existed, it is not necessary to resolve this conflict in testimony.

ment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). It is equally well settled that when a federal agent conducts a search in violation of a defendant's fourth amendment rights, any evidence seized during the search cannot be admitted in a criminal trial against that defendant. *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). Here, the United States admits that its attempt to obtain a telephonic search warrant fell short and that the search was conducted without a valid warrant. Accordingly, the evidence seized during the search must be suppressed unless the search was "reasonable" under one of the established exceptions to the requirement that a search be conducted pursuant to a valid search warrant.

### A. Good Faith

■ In a preliminary matter, the United States argues that the exclusionary rule does not apply here because the officers acted in good faith. This contention is frivolous at best. The circumstances of this case are wholly different from the circumstances in *United States v. Leon*, — U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the case in which the Supreme Court announced the good faith exception to the exclusionary rule. In *Leon*, the officers relied on a facially valid search warrant, and conducted the search relying in good faith on the validity of the warrant. Under those circumstances, applying the exclusionary rule to suppress evidence would not have deterred inappropriate police conduct in the future, so the Court determined that the salutary purpose of the exclusionary rule would not be served if the evidence were suppressed.

In this case, Crew and Goodwin did not rely on a facially valid warrant. In order to obtain a valid telephonic search warrant in Utah,[4] an officer must read to the magistrate the contents of the warrant (referred to as the duplicate original warrant), and, after the magistrate has approved the contents of the warrant, the officer must sign the warrant with the magistrate's name. Utah Code Ann. § 77–23–4(2) (1982). In addition, the magistrate must record the warrant as it is read to him, and he must then sign what he has recorded. In this case, the officers did not comply with the statute. The officers read nothing to the magistrate. Nothing was signed and nothing was returned. The magistrate did not record what was related to him. No duplicate original was made out or kept by the officers. Accordingly, there was no facially valid warrant on which Crew and Goodwin could have relied.

The United States contends that the police cannot be expected to know the procedures for obtaining a valid telephonic search warrant. This argument is novel. The State of Utah has created a means by which law enforcement officers in remote areas can obtain a search warrant on short notice without being in the actual presence of the magistrate. The law was written specifically to assist officers who work in less populated regions of the state and who would be hampered in their duties if they were unable to obtain a search warrant whenever a magistrate is not close by. However, those officers can benefit from the procedure only if they know what it is. Knowing that it exists is not enough. In essence, the United States takes the position that the well-known legal maxim "ignorance of the law is no excuse" does not apply to law enforcement officials. This court refuses to adopt such an untenable

---

**4.** Federal Rule of Criminal Procedure, Rule 41(c)(2) also allows a federal law enforcement officer to obtain a telephonic search warrant from a federal magistrate. That rule does not allow a state magistrate to issue a telephonic search warrant, although it does not prohibit a state magistrate from issuing a telephonic search warrant pursuant to state law. Because the parties admit and the court finds that the telephonic search warrant issued pursuant to state law was invalid, the court does not consider the defendants' contention that the evidence must be suppressed in the federal court if a telephonic search warrant is issued by a state magistrate.

position. It is not "good faith conduct" to rely on a telephonic search warrant which is patently invalid and which an officer should know is patently invalid.

Even if the court were to adopt the position the United States urges, it would not benefit the United States here. Officer Goodwin testified that he had previously obtained telephonic search warrants, and that he knew the procedural requirements. An officer who knows that a telephonic search warrant was not obtained in compliance with the law, but nevertheless relies on that warrant to conduct a search, is not acting in good faith.

The purpose of the exclusionary rule is to deter official misconduct in the future. In *Leon*, the Supreme Court concluded that applying the exclusionary rule in that case would not promote that objective. In this case, suppressing the evidence would promote that objective by deterring police officers from ignoring the procedural requirements necessary to obtain a valid telephonic search warrant. Requiring the officer to read the contents of the warrant to the magistrate and requiring the magistrate to record what was read to him allows a reviewing court to determine whether probable cause had been established. Without the writings, the court is left, as it is here, with differing versions of what was said. Accordingly, the court rejects the government's argument and holds that the good faith exception to the exclusionary rule does not apply when the procedures for obtaining a telephonic search warrant are ignored.

### B. *Reasonable Expectations of Privacy*

■ The United States next asserts that the defendants did not have a reasonable expectation of privacy in either the airplane or the hangar, and hence, the defendants have no right to challenge the search. In *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Supreme Court ruled that a defendant's right to challenge a search no longer depends on traditional notions of standing. Instead, the court must determine whether the

"search" was a constitutionally protected one. In making that determination, the court must answer two inquiries: First, did the defendant have an actual, subjective expectation of privacy in the object of the search, and second, does society recognize that expectation of privacy to be reasonable? *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979). *See also, Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). The court has previously found that both Ransom and Mayer had a subjective expectation of privacy in the hangar and its contents. Accordingly, the controlling inquiry is whether that expectation is one that society recognizes to be reasonable.

In *Rakas*, the Supreme Court stated that "one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude." 439 U.S. at 143–44, n. 12, 99 S.Ct. at 430–31, n. 12. In other words, if a defendant has a legal right to exclude others from the object of the search, society will recognize that his expectation of privacy in the object of the search is reasonable. Here, the defendant Mayer had subleased the hangar and had paid rent for it. As a sublessee, he had a legal right to exclude others from the hangar. Accordingly, his expectation of privacy in the hangar and in its contents was an expectation that society recognizes to be reasonable.

Ransom's expectation was also one that society recognizes to be reasonable. Mayer, who had a leasehold interest in the hangar, had given Ransom permission to store tools in the hangar. More importantly, Mayer had also given Ransom a key. With that key, Ransom had the ability—as well as the legal right—to prevent others from entering the hangar. Under these circumstances, society recognizes that Ransom's expectation of privacy in the hangar and its contents was reasonable.

The Court of Appeals' holding in *United States v. Hansen*, 652 F.2d 1374, 1384 (10th Cir.1981), does not require a contrary find-

**256**

ing. In that case, Hansen's possession of a key was not enough to demonstrate a reasonable expectation of privacy in the room the key opened. He had expressly denied having any interest in that room, and he testified that the key did not belong to him. Ransom, however, has expressed an interest in the hangar, and he has actually used the key to exclude others from the hangar.

Both Mayer and Ransom had a reasonable expectation of privacy in both the hangar and its contents. Accordingly, the search was a constitutionally protected one, and both Mayer and Ransom have "standing" to move to suppress the evidence obtained during the search.

### C. Exigent Circumstances

■ The United States next argues that the officers were entitled to search the hangar because of the existence of exigent circumstances. The law on exigent circumstances is also well settled. "[A] warrantless entry for some limited purposes is permissible if police officers have probable cause to search the residence and exigent circumstances are present." *United States v. Cuaron*, 700 F.2d 582, 586 (10th Cir.1983). In order to justify a search under the exigent circumstances exception, the United States must establish (1) that the officers had probable cause to search the hangar and its contents, and (2) that exigent circumstances existed. Because the court finds that exigent circumstances did not exist and that there was sufficient time to obtain a warrant, it is not necessary to determine whether the officers had probable cause in the context of this motion.

■ Exigent circumstances exist when the societal costs of obtaining a warrant sufficiently outweigh the reasons for prior recourse to a neutral magistrate. *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979). The courts have found exigent circumstances to exist when there was danger of flight or escape, when there was danger of harm to the police or the public, and when there was a risk of loss, destruction, removal, or concealment of evidence. In this case, there was no

opportunity for escape. The suspects were locked inside a hangar with no way to get out unless someone from the outside of the hangar let them out. In addition, there was no danger of harm to the police or the public. Although the government argues in its memoranda that drug runners are known to carry weapons, no one testified that he believed himself to be in any danger.

Similarly, there was no danger that evidence would be destroyed. The government argues that evidence could have been flushed down a toilet or put in the fuel tank of the airplane. However, not a single witness testified that he was concerned that evidence might be destroyed before a search warrant could be obtained. Not a single witness testified that he believed the hangar—an enclosure not much larger than the airplane itself—even had a toilet or sink in it. Not a single witness expressed any concern whatsoever that anyone believed the evidence would be destroyed if they did not act quickly.

Even if the police had reasonably believed there was a risk that evidence would be destroyed, there was sufficient time to obtain a telephonic search warrant. "[T]rial courts must consider the availability of a telephone warrant in determining whether exigent circumstances existed, unless the critical nature of the circumstances clearly prevented the effective use of any warrant procedure." *Cuaron*, 700 F.2d at 589. In this case, there obviously was an opportunity to obtain a warrant by telephone. Crew and Goodwin tried to do just that. Their utter failure to follow required procedures does not create exigent circumstances when the circumstances are not otherwise exigent. Accordingly, the search cannot be justified under the exigent circumstances exception.

### D. Border Search.

■ Finally, the United States argues that the search was justified as a search at the functional equivalent of the border. It

is well settled that a customs agent[5] may, without a warrant and without probable cause, stop and search someone crossing an international border to determine whether that person is entitled to enter the country and to determine whether that person is carrying contraband. *Carroll v. United States*, 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925). In *Almeida-Sanchez v. United States*, 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973), the Supreme Court stated that "[w]hatever the permissible scope of intrusiveness of a routine border search might be, searches of this kind may in certain circumstances take place not only at the border itself, but at its functional equivalents as well." As an example, the Court suggested that "a search of the passengers and cargo of an airplane arriving at a St. Louis airport after a non-stop flight from Mexico City would clearly be the functional equivalent of a border search." *Id.* at 273, 93 S.Ct. at 2539.

■ There are several distinct subclasses of border searches that are commonly confused. One, known as a "search at the functional equivalent of the border," is a search at the first practicable point after a person has entered the country, even though that point may be hundreds or perhaps thousands of miles from the border. *Id.* A second subclass, known as the "extended border search," takes place when customs agents follow a suspected smuggler in hopes of netting others. *Alexander v. United States*, 362 F.2d 379 (9th Cir.), *cert. denied*, 385 U.S. 977, 87 S.Ct. 519, 17 L.Ed.2d 439 (1966). A third, based on *United States v. Weil*, 432 F.2d 1320 (9th Cir.1970), *cert. denied*, 401 U.S. 947, 91 S.Ct. 933, 28 L.Ed.2d 230 (1971), is a

search of something known not to have crossed the border, justified because the customs agents are reasonably certain that it contains something that has crossed the border. This case involves two of these subclasses: a *Weil*-type search at the functional equivalent of the border.

The Eleventh Circuit has fashioned a three-part test to determine whether a search is at the functional equivalent of the border. *United States v. Carter*, 760 F.2d 1568, 1576 (11th Cir.1985). First, the officers conducting the search must be reasonably certain that the object of the search had crossed an international border. Second, the search must take place at the first practicable point after the border was crossed. And third, there must have been no time or opportunity for the object of the search to have changed materially since the time of the crossing—that is, the officers conducting the search must be reasonably certain that contraband was not placed in the object of the search after the border was crossed.

The only genuine dispute in this case is over whether the officers were reasonably certain that the object of the search—the airplane—had crossed an international border. Since a search was not possible until the plane landed, the court is satisfied that the search took place at the first practicable point after the alleged border crossing. In addition, the court is satisfied that there was not time or opportunity for the object of the search to have changed materially from the time of the crossing until the plane was placed in the hangar. The plane was under constant surveillance from the time it was first discovered until it was placed in the hangar.[6]

---

5. In this case, the customs agents were assisted by Beaver County sheriff deputies. That is permissible so long as the search is "executed under the authority and direction of those agencies having jurisdiction in safeguarding the borders." *United States v. Alfonso*, 759 F.2d 728, 735 (9th Cir.1985). *Cf. United States v. Soto-Soto*, 598 F.2d 545, 549 (9th Cir.1979) (border search conducted by the FBI violates fourth amendment). The court finds that the search was under the authority and direction of the customs agents.

6. It is true that the search itself did not take place for about a half hour, and that during the hiatus the plane was in a hangar. However, the court does not consider realistic the possibility that contraband could have been placed on the plane while it was in the hangar. As is more fully explained later in the court's opinion, the search of the hangar was also justified under border search principles.

It is also true that the plane was not discovered until it was 58 miles north of the border. Accordingly, it is possible that the plane could

This case presents an additional twist not found in most other border search cases: The court must determine what the object of the search was. Although the government argues that the plane was the object of the search, the plane had been pushed into a hangar before it was searched. Obviously, no one suggests that the hangar had recently crossed an international border. Therefore, even assuming the plane itself had crossed the border, can a border search be expanded to cover the small hangar and its contents, or must the search be limited to the plane itself? And if the search cannot be expanded to cover the hangar and its contents, is the search of the plane then prohibited because the plane was part of the contents of the hangar?

A line of cases originating in the Ninth Circuit offers considerable guidance. In *United States v. Weil*, 432 F.2d 1320, 1323 (9th Cir.1970), the court stated:

> It seems obvious to us that the right of customs agents to search a vehicle without probable cause is not confined to vehicles that have crossed the border. For example, if customs agents see a vehicle cross the border, and see the occupant then transfer parcels from that vehicle to another that has not crossed the border, the agents surely have a right to search the latter vehicle.

This court finds the reasoning of the Ninth Circuit to be persuasive. It is settled law that "searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border." *United States v. Ramsey*, 431 U.S. 606, 616, 97 S.Ct. 1972, 1978, 52 L.Ed.2d 617 (1977). It is true that placing

a parcel that had been carried across the border into a vehicle heightens the expectation of privacy in the parcel. However, the court finds that such a heightened expectation is not sufficient to make an otherwise reasonable search unreasonable.[7] The search is still a border search. A contrary holding would unnecessarily hamper customs agents from securing the nation's borders.

The court can find no distinction, for purposes of this motion, between a parcel placed in a car and an airplane placed in a hangar. The same principles apply. Accordingly, the court holds that when customs agents are reasonably certain that an airplane has crossed an international border, a warrantless search of the airplane as soon as possible after the plane has landed is reasonable under the fourth amendment even though the airplane had been pushed into a hangar. In addition, the court holds that when customs agents are reasonably certain that an airplane has crossed an international border and that the airplane has been pushed into a hangar, a warrantless search of the hangar and its contents in connection with a search of the plane is also reasonable.

Therefore, the controlling inquiry in the court's determination of whether the search was at the functional equivalent of the border is whether the officers were reasonably certain that the airplane had crossed an international border. The Ninth Circuit has defined "reasonable certainty":

> While the "reasonable certainty" required has not been precisely defined, it has been noted that " 'reasonable certainty' is clearly a higher standard than that of probable cause." *United States v.*

---

have picked up contraband after crossing the border but before being discovered. The court finds that if the officers were reasonably certain that the plane had come from Mexico, the possibility that it stopped at a point north of the border to pick up contraband would be so unlikely that the customs agents could have concluded with reasonable certainty that there was no time or opportunity to place contraband on board the airplane after crossing the border.

7. LaFave, in his treatise on the fourth amendment, suggests that although a *Weil*-type search is "more intrusive because not done as a matter of routine at a border checkpoint, it seems that ordinarily there will be reasonable suspicion of wrongdoing flowing from the reasonable certainty of entry without inspection." 3 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment 302–03 (1978).

*Kessler,* 497 F.2d 277, 279 (9th Cir.1974). *See also United States v. Bates,* 533 F.2d 466 (9th Cir.1976). It is, however, directed to a different question: if the customs agents are reasonably certain that a boat crossed the border, the boat may be subjected to a border search without any cause at all to believe that any crime is being committed. We do not believe that "reasonable certainty" is so much stricter than probable cause as to require that the agents have knowledge of facts which prove a border crossing beyond a reasonable doubt. We conclude that the only modification of ordinary probable cause required is that the totality of the facts and circumstances within the officers' knowledge and of which they have reasonably trustworthy information be sufficient in light of their experience to warrant a *firm* belief that a border crossing has occurred.

*United States v. Tilton,* 534 F.2d 1363, 1366 (9th Cir.1976) (emphasis in original).

In this case, the court finds that the information the officers relied on was trustworthy, that the totality of the facts and circumstances within the officers' knowledge were sufficient in light of their experience to warrant a firm belief that a border crossing had occurred. The plane was first discovered in a restricted area where it should not have been. It was coming from an unpopulated area. It was flying at a low altitude. It was flying in a direction that was inconsistent with the usual pattern of traffic in the area. It did not have a transponder. From the time it was discovered until the time it landed, it continued on a constant course. These facts, taken together gave the customs officers reason to believe that the plane came from beyond the border. The officers' experience in evaluating these facts immediately suggested to them that they had discovered smuggling activity. The defendants' efforts to conceal the plane by turning off its running lights 30 to 40 minutes before landing, when considered in light of the other facts known to the customs officers, fortified the officers' belief. The court finds that all this information, when considered as a whole, was sufficient to satisfy the reasonable certainty test.

The defendants suggest that turning off the running lights supports an inference of smuggling activity from within the country as much as it supports an inference of smuggling activity from Mexico. If that were the only fact available to the officers, the court would agree. However, when considered with all the information available to the officers at the time, the fact that the lights were turned off for 30 or 40 minutes before landing, and the fact that the defendants landed the aircraft without benefit of lights, colored all of the facts known to the officers and fortified the officers' belief that the plane had crossed the border.

The defendants also argue that the plane could have come from one of the two small airfields south of the point that the plane was first discovered. Although that may have been possible, the court finds that the totality of the circumstances suggested it was not likely. The mere existence of the two airfields is not sufficient to prevent the government from satisfying the reasonable certainty test. The test is *reasonable* certainty, not absolute certainty.

Finally, the defendants assert that in order to satisfy the reasonable certainty test, the customs officers must locate the plane prior to its crossing the border. The court disagrees. In *United States v. Adams,* 569 F.2d 924 (5th Cir.1978), *cert. denied,* 439 U.S. 967, 99 S.Ct. 457, 58 L.Ed.2d 426 (1978), the court found that there was reasonable certainty that a truck had crossed the border even though the truck, which was traveling on a road parallel to the border, was first discovered a short distance from the border. Fresh mud on the sides of the truck indicated to the officers that the track had come from the riverbed.

The court has been unable to find a case involving an airplane that was not located before it crossed the border or that did not have a foreign point of departure. *See United States v. Garcia,* 672 F.2d 1349 (11th Cir.1982) (plane located prior to crossing border); *United States v. Ivey,* 546 F.2d 139 (5th Cir.), *cert. denied sub nom.,*

*Taglione v. United States,* 431 U.S. 943, 97 S.Ct. 2662, 53 L.Ed.2d 263 (1977) (plane seen in the British West Indies prior to being spotted in the United States). The court nevertheless finds that based on the totality of the circumstances, the officers had sufficient information in light of their experience to warrant a firm belief that a border crossing has occurred.

The defendants rely heavily on *United States v. Brennan,* 538 F.2d 711 (5th Cir. 1976), *cert. denied,* 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538 (1977). In *Brennan,* a plane left the Melbourne Regional Airport at 11:00 a.m. and travelled in a southwesterly direction. Radar contact with the plane was lost over Miami. About 13½ hours later the plane landed again at Melbourne. The court concluded that the contact with the border was "simply too attenuated ... to support this search as one occurring at the functional equivalent of an international border." *Id.* at 715.

This case is different from *Brennan.* In *Brennan* the available information could not have supported a "firm belief" that the plane had crossed the border. Had an untested informant not given customs officers a tip, there would have been no reason to believe that the plane had crossed a border rather than come from Des Moines. It was possible that the plane had crossed a border—indeed, the informant had said the plane was going to leave the country—but that possibility did not satisfy the reasonable certainty test.[8] Here, as indicated above, the test is satisfied. Nothing in *Brennan* changes the court's conclusion.

Accordingly, the search of the airplane and hangar in Milford, Utah, was reasonable under the fourth amendment. The evidence seized during that search is admissible against the defendants in their criminal trial.

### III. MOTION TO SUPPRESS THE STATEMENTS MADE BY THE DEFENDANT RANSOM

 The fifth amendment to the Constitution of the United States provides that

"No person ... shall be compelled in any criminal case to be a witness against himself." In *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), the Court held:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of [a] defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way.

In the years following *Miranda,* the courts have frequently reaffirmed the principle that when a police officer takes a suspect into custody and asks him questions without first informing him of his rights, any statements the suspect makes before being informed of his rights cannot be introduced as evidence in his criminal trial. *Berkemer v. McCarty,* ── U.S. ──, 104 S.Ct. 3138, 3145, 82 L.Ed.2d 317 (1984).

In this case, the government has not demonstrated that the defendant was informed of his rights prior to being questioned. Therefore, the sole inquiry is whether, at the time he was questioned, the defendant was in custody—whether he had been deprived of his freedom in any significant way. The evidence on this point is sketchy. The defendant himself did not testify about whether he believed that he was free to go. What testimony the court heard from the government indicates that the interrogations were custodial.

Without question, the second conversation (the conversation about the key to the hangar) took place after the defendant was in custody. He had been handcuffed and placed in a patrol car. Accordingly, any statements he made at that time must be suppressed.

---

**8.** Because The informant was untested, his tip was not sufficiently reliable to be used as information to support a search at the functional equivalent of the border.

At the time the defendant was first questioned about his presence at the airport, he had been searched but not yet handcuffed. However, as soon as he asked to see his attorney, he was handcuffed and placed in the patrol car. The fact that he gave no answer that would suggest he was involved in criminal activity but was immediately arrested after asking to see his attorney, suggests that at the time he was questioned, he was not free to leave. This suggestion is reinforced by Agent Crew's testimony that he had directed Goodwin to detain Ransom until Crew could question him. All of this leads the court to conclude that even during the initial questioning, Ransom was in custody. At that point, the officers had an obligation to inform him of his rights. Their failure to do so requires this court to suppress the statements Ransom made at that time.[9]

## IV. CONCLUSION AND ORDER

For the reasons stated in this opinion, the court finds that the evidence seized during the search of the hangar and the airplane is admissible against the defendants. However, the statements that the defendant Ransom made in response to the officers' questions must be suppressed. Accordingly, the defendant Mayer's motion to suppress is DENIED, and the defendant Ransom's motion to suppress is GRANTED IN PART and DENIED IN PART.

---

**9.** Although the search of the hangar and the airplane followed a violation of the defendant's constitutional rights, the subsequent search was not the fruit of a poisonous tree. Without the key, the officers would have cut the lock off and searched the hangar anyway.